# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 1, 2011         Decided June 22, 2012

No. 10-1183

NATIONAL ASSOCIATION OF HOME BUILDERS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

———

On Petition for Review of a Final Rule of
the Environmental Protection Agency

———

*Thomas C. Jackson* argued the cause and filed the briefs for petitioners.

*Stephanie J. Talbert*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the briefs was *John C. Cruden*, Deputy Assistant Attorney General.

*Aaron Colangelo* was on the brief for *amicus curiae* National Center for Healthy Housing in support of respondent.

Before: ROGERS and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: In 2008, the Environmental Protection Agency (EPA) issued a rule regulating renovation and remodeling activities that create health hazards arising from lead paint. The rule contained an "opt-out" provision, which exempted owner-occupied housing from the rule's requirements if the homeowner certified that no pregnant women or young children lived there. In 2010, EPA amended the rule to eliminate the opt-out provision.

The National Association of Home Builders and other trade associations petition for review of the amended rule on two grounds: that the decision to abandon the opt-out provision was arbitrary and capricious, in violation of the Administrative Procedure Act; and that EPA failed to convene a panel of representatives of small businesses before issuing the new rule, in violation of the Regulatory Flexibility Act. Because we conclude that EPA's decision was not arbitrary or capricious, and because we lack jurisdiction to entertain the petitioners' second challenge, we deny the petition for review.

I

Finding that low-level lead poisoning affected millions of American children, Congress passed the Residential Lead-Based Paint Hazard Reduction Act of 1992, Pub. L. No. 102-550, 106 Stat. 3897 (1992), with the purpose of "eliminat[ing] lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. § 4851a(1). The Act amended another statute, the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq.*, by adding Title IV, entitled "Lead Exposure Reduction." Section 402(a) directed EPA to "promulgate final regulations governing lead-based paint activities to ensure that individuals engaged in such activities are properly trained; that training programs are accredited; and that contractors engaged in such activities are certified." 15 U.S.C. § 2682(a)(1). The section further directed

that the regulations "contain standards for performing lead-based paint activities, taking into account reliability, effectiveness, and safety." *Id*. Another provision, section 402(c)(3), required EPA within four years to revise the regulations to apply "to renovation or remodeling activities in target housing, public buildings constructed before 1978, and commercial buildings that create lead-based paint hazards." *Id*. § 2682(c)(3). The statute defines "target housing" as "any housing constructed prior to 1978," with certain exceptions not relevant here. *Id*. § 2681(17).

Pursuant to these provisions, in 2008 EPA issued a final rule establishing work-practice, training, and recordkeeping requirements for "renovations performed for compensation in target housing and child-occupied facilities." *See* Lead; Renovation, Repair, and Painting Program, 73 Fed. Reg. 21,692, 21,759 (Apr. 22, 2008) [hereinafter Renovation Rule].[1] Among other things, the Renovation Rule requires renovators to post warning signs outside the work area, to cover the work area with plastic sheets to prevent the diffusion of lead dust, and to clean the area thoroughly after the work is completed. *Id*. at 21,704-05.

The 2008 Renovation Rule contained an exemption for owner-occupied target housing in which no pregnant women or children under six resided and that did not otherwise meet the definition of a child-occupied facility. An owner-occupant

---

[1] The Rule defined "child-occupied facility" as a "a building, or portion of a building, constructed prior to 1978, visited regularly by the same child, under 6 years of age, on at least two different days within any week (Sunday through Saturday period), provided that each day's visit lasts at least 3 hours and the combined weekly visits last at least 6 hours, and the combined annual visits last at least 60 hours." 73 Fed. Reg. at 21,702.

could "opt out" by signing a statement certifying that the housing qualified for this exemption, and renovations could then proceed without following the training, certification, and work-practice requirements of the rule. EPA acknowledged that most commenters opposed this "opt-out" amendment because it left guests, older children, and adults unprotected, as well as those who move into recently renovated housing. *Id*. at 21,709-10. After balancing the relevant considerations, however, EPA decided that a more protective rule, without the opt-out provision, would not be "an effective use of society's resources." *Id*. at 21,710.

Several petitions for review were filed in this court. In August 2009, EPA signed an agreement with environmental and health advocacy groups to settle their petitions. Pursuant to the agreement, EPA committed to propose amendments to the Renovation Rule, including one eliminating the opt-out provision. Thereafter, EPA proposed, and ultimately promulgated, the amended rule that is the subject of the instant case. *See* Lead; Amendment to the Opt-Out and Recordkeeping Provisions in the Renovation, Repair, and Painting Program, 75 Fed. Reg. 24,802 (May 6, 2010) [hereinafter Amended Renovation Rule]. The Amended Renovation Rule removed the opt-out provision. EPA explained that, "[b]y removing the opt-out provision, the rule will go farther toward protecting children under age 6 and pregnant women, as well as older children and adult occupants of target housing where no child under age 6 or pregnant woman resides." *Id.* at 24,804. "[I]mplementing the regulations without the opt-out provision," EPA concluded, "promotes, to a greater extent, the statutory directive to promulgate regulations covering renovation activities in target housing." *Id.* at 24,806.

The National Association of Home Builders (NAHB) and other trade associations now petition for review of the Amended

Renovation Rule on two grounds. First, they contend that EPA's decision to remove the opt-out provision was arbitrary and capricious, in contravention of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Second, they charge that EPA violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601 *et seq.*, because it failed to convene a small business advocacy review panel to assess the impact of eliminating the opt-out provision, *see id.* § 609(b). We address the first contention in Part II and the second in Part III.

## II

The Toxic Substances Control Act (TSCA) authorizes judicial review of EPA regulations under the standard prescribed by the Administrative Procedure Act (APA), 5 U.S.C. § 706. *See* 15 U.S.C. § 2618(c)(1)(A), (B). The APA authorizes a court to set aside agency action that is "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). The petitioners contend that removing the opt-out provision from the Renovation Rule was arbitrary and capricious for multiple reasons. Although we have given careful consideration to all of the petitioners' arguments, we address only the strongest ones below.

6

A

The essence of the petitioners' argument is that it was arbitrary and capricious for EPA to change its mind about the opt-out provision. In 2008, they maintain, EPA "provided a reasoned basis for its approach that was consistent with congressional intent." NAHB Br. 16. "In contrast," they continue, "EPA has provided no justification for its decision to reverse course . . . that is grounded in any information or experience that was not available to the Agency when it included the Opt Out Provision in the original rule." *Id.* Rather, EPA "merely revisited old arguments that had already been addressed as part of the original rulemaking." *Id.* Although the petitioners acknowledge that "a federal agency has the authority to change its mind," they insist in these circumstances that "under the APA, the agency has to be held to a higher standard" when it does. Oral Arg. Recording at 2:20-:55.

This kind of argument is largely foreclosed by *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), in which the Supreme Court declared that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review." *Id.* at 514. As the Court explained:

> The Act mentions no such heightened standard. . . . To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the

> reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.

*Id*. at 514-15 (citation omitted).

In light of *Fox*, we must reject the petitioners' contention that, "because the Rule eliminates a provision that was consistent with congressional intent, the Court should not defer to EPA in making such a decision." NAHB Br. 19-20. The fact that the original opt-out provision was consistent with congressional intent is irrelevant as long as the amended rule is also "permissible under the statute." *Fox*, 556 U.S. at 515. The petitioners acknowledge that, although they believe the original rule was better, the amended rule is permissible. Oral Arg. Recording at 17:40-:43. As *Fox* made clear, that "suffices" as far as the court is concerned. *Fox*, 556 U.S. at 515.[2]

*Fox* likewise dispenses with the petitioners' complaint that the Amended Renovation Rule merely revisits old evidence and arguments, rather than adduces "new data" or experience. NAHB Br. 17. As *Fox* noted, the Supreme Court has "neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in first instance." *Fox*, 556 U.S. at 514 (citing *State Farm*, 463 U.S. at 42). To the contrary, the

---

[2] The petitioners' opening brief suggested that the amended rule exceeds EPA's statutory authority. NAHB Br. 24-27. The petitioners appeared to abandon the argument in their reply brief by relegating it to a footnote, *see* NAHB Reply Br. 10 n.2, and then conceded at oral argument that the TSCA permits the action the agency took, Oral Arg. Recording at 17:43.

*State Farm* case affirmed that "'[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances.'" *State Farm*, 463 U.S. at 57 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *see Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967) (declaring that an agency, "in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings").

It is true, as the petitioners stress, that an agency changing course is sometimes obligated to "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . -- when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *Fox*, 556 U.S. at 515. "In such cases, . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." *Id*. at 516. But the petitioners cannot point to any new findings, let alone contradictory ones, upon which EPA relied. *See* Oral Arg. Recording at 6:00-:51, 8:43-9:30. To the contrary, the gravamen of their complaint is that EPA offered no new evidence to support its decision. *See* NAHB Br. 21. And in that respect, the petitioners are correct: EPA did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts. *See, e.g.*, 75 Fed. Reg. at 24,804 (explaining that removal of the opt-out provision "will *go farther* toward protecting children under age 6 and pregnant women, as well as older children and adult occupants of target housing where no child under age 6 or pregnant woman resides" (emphasis added)). *Fox* makes clear that this kind of reevaluation is well within an agency's discretion. 556 U.S. at 514-15.

That leaves us with the responsibility to ensure that EPA satisfied the core requirement that *Fox* makes clear an agency

must meet when changing course: it must "provide reasoned explanation for its action," which "would ordinarily demand that it display awareness that it *is* changing position." *Fox*, 556 U.S. at 515.[3] In this case, there is no doubt that EPA knew it was changing its position. *See, e.g.*, Proposed Rule, Lead; Amendment to the Opt-out and Recordkeeping Provisions in the Renovation, Repair, and Painting Program, 74 Fed. Reg. 55,506, 55,506 (Oct. 28, 2009) ("proposing to eliminate" the opt-out provision); Amended Renovation Rule, 75 Fed. Reg. at 24,802 ("eliminating" the provision). Nor is there any doubt that the agency provided a reasoned explanation for its decision. In the following discussion, we set forth only the more significant aspects of that explanation.

First, EPA explained that the opt-out provision -- which exempted renovation and remodeling of owner-occupied buildings from lead-paint work-practice standards if no children under six or pregnant women lived there -- was "not sufficiently protective [even] for children under age 6 and pregnant women, the most vulnerable populations." Amended Renovation Rule, 75 Fed. Reg. at 24,804. EPA noted, for example, that "the opt-out provision does not protect families with young children who may purchase recently renovated target housing." *Id.* Although the agency had originally thought this problem could

---

[3]The failure to satisfy this core requirement explains why we vacated agency orders in the cases the petitioners' briefs bring to our attention. *See, e.g.*, *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 329 (D.C. Cir. 2006) (vacating FERC orders because, "instead of openly acknowledging its intention to reverse course to bring order to its case law, FERC attempted to gloss over its prior holding" (internal quotation marks and alteration omitted)); *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003) (vacating FAA orders because they were "unexplained departures from precedent").

be mitigated by a rule requiring sellers of target housing to disclose known lead-based paint hazards to purchasers, upon reconsideration it concluded that a rule that "only requires disclosure of known hazards . . . would not require disclosure of renovation activities or that the owner opted out of the [Renovation] rule requirements." *Id.* EPA was also concerned that "[v]isiting children who do not spend enough time in the housing to render it a child-occupied facility may nevertheless be exposed to lead from playing in dust-lead hazards created by renovations." *Id.* And EPA further worried that "[r]enovations on the exterior of a residence can spread leaded dust and debris some distance from the renovation activity," creating dangers for families with young children living nearby. *Id.*; *see* Economic Analysis for the TSCA Lead Renovation, Repair, and Painting Program Opt-out and Recordkeeping Final Rule, at 5-12 (2010) [hereinafter 2010 Economic Analysis] (J.A. 290) (concluding, based on census data, that 23,000 children under age six living in homes attached to renovated target housing would be protected by eliminating the opt-out provision).

Second, EPA determined that the "opt-out provision d[id] not sufficiently account for the importance of the health effects of lead exposure on adults and children age 6 and older." Amended Renovation Rule, 75 Fed. Reg. at 24,805-06. Citing studies finding that "lead paint dust exposure can cause adverse health effects" in older children and adults, EPA determined that "work practices should be followed in target housing without regard to the age of the occupants." *Id*. at 24,806.

In light of these and other (re)considerations, EPA concluded that the amended rule "promotes, *to a greater extent*, the statutory directive to promulgate regulations covering renovation activities in target housing." *Id*. (emphasis added). This conclusion was not impermissible under the TSCA. As the agency explained, the statutory definition of target housing is

broad -- "'any housing constructed prior to 1978,'" with exceptions not relevant here. *Id.* (quoting 15 U.S.C. § 2681(17)). And the statute says nothing, one way or the other, about restricting the protection afforded by renovation regulations to pregnant woman and children under six; instead, the TSCA simply "directs EPA to promulgate regulations that apply to renovation activities that create lead-based paint hazards in target housing." *Id.* (citing 15 U.S.C. § 2682(c)(3)). Moreover, because the Act directs EPA to promulgate regulations that "contain standards for performing lead-based paint activities, taking into account reliability, effectiveness, and safety," 15 U.S.C. § 2682(a)(1), it was hardly arbitrary or capricious for EPA to issue an amended rule it reasonably believed would be more reliable, more effective, and safer than the original rule. The agency's explanation thus readily satisfies the standard of judicial review elucidated in *Fox* and *State Farm*.

B

In addition to charging that the Amended Renovation Rule constitutes an arbitrary and capricious change in course, the petitioners contend it is arbitrary and capricious because its costs outweigh its benefits.

We note first that EPA does not have a statutory duty to demonstrate that the benefits of the amended rule outweigh its costs. The TSCA was passed in 1976 with the following preface: "It is the intent of Congress that the Administrator shall carry out this chapter in a reasonable and prudent manner, and that the Administrator shall consider the environmental, *economic*, and social impact of any action the Administrator takes or proposes to take under this chapter." 15 U.S.C. § 2601(c) (emphasis added). Although the TSCA thus "expressly requires the Administrator to consider" the

"economic consequences" of action taken under the Act, *Envtl. Def. Fund v. EPA*, 636 F.2d 1267, 1276 (D.C. Cir. 1980), this does not mean that the regulation's benefits must outweigh its costs. *Cf. Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570-71 (D.C. Cir. 2002) (noting that although the Clean Water Act "requires that, when setting [new source performance standards], the [EPA] Administrator must take costs into consideration," it "does not require that she conduct a cost-benefit analysis"). Indeed, when Congress amended the TSCA in 1992 to authorize regulations addressing lead-paint hazards, it instructed EPA to "tak[e] into account reliability, effectiveness, and safety" -- but did not mention cost. 15 U.S.C. § 2682(a)(1).

Notwithstanding the absence of a statutory duty, EPA did undertake a cost-benefit analysis before promulgating the Amended Renovation Rule -- an analysis that it concluded supported eliminating the opt-out provision. *See* 2010 Economic Analysis (J.A. 185); *see also* Amended Renovation Rule, 75 Fed. Reg. at 24,811-12 (summary of the economic analysis). And when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (noting that "we will [not] tolerate rules based on arbitrary and capricious cost-benefit analyses"); *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating regulatory provisions because the cost-benefit analysis supporting them was based on an unexplained methodology). Nonetheless, we review such a cost-benefit analysis deferentially. *See Nat'l Wildlife Fed'n*, 286 F.3d at 563 (holding that "we do not review EPA's cost figuring de novo, but accord EPA discretion to arrive at a cost figure within a broad zone of reasonable estimate" (internal quotation marks omitted)). And "in view of the complex nature of

economic analysis typical in the regulation promulgation process, [the petitioners'] burden to show error is high." *Id.*; *see Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006) (noting that "cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency" (internal quotation marks omitted)).

At first blush, the petitioners offer a plausible argument that EPA "stacked the deck" in favor of rescission by comparing the *additional* costs of the Amended Renovation Rule with its *total* benefits. NAHB Reply Br. 13. As the petitioners note, in calculating the costs of the amended rule, the agency considered only "the *additional* cost of the rule, beyond what renovators are already doing." *Id.* (quoting EPA, Response to Public Comments at 22 (J.A. 349)); *see* 2010 Economic Analysis at 4-50 (J.A. 236). By contrast, the petitioners contend that, in calculating the benefits of the rule, EPA "estimate[d] the total benefits" by "assum[ing] . . . that no contractors are employing work practices required under the [original Renovation] Rule in the 'opt-out' scenarios." NAHB Reply Br. 15 (citing, but not quoting, 2010 Economic Analysis at 5-5 (J.A. 283)). In short, the petitioners charge that EPA was comparing apples to oranges.

There are two problems with this argument. First, it was never raised in either the rulemaking comments or the petitioners' opening appellate brief. *See* Oral Arg. Recording at 32:22 (acknowledgment by petitioners' counsel). Because this deprived EPA of a meaningful opportunity to respond to the argument, it is waived. *See Nat'l Wildlife Fed'n*, 286 F.3d at 562 (declining to reach the merits of challenges to cost estimates because "issues not raised in comments before the agency are waived"); *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 9 n.9 (D.C. Cir. 2011) (per curiam) ("[A]rguments not raised until the reply brief are waived.").

In any event, the argument appears to be based on a faulty premise. The page of the 2010 Economic Analysis cited by the petitioners merely explains that, to calculate the benefits of the rule, EPA used an average measure of benefits from the 2008 Economic Analysis it had conducted for its original Renovation Rule, and then multiplied the average by the number of people specifically affected by eliminating the opt-out provision. 2010 Economic Analysis at 5-5 (J.A. 283). But in calculating the benefits, the 2008 Economic Analysis *did* take into account the fact that some contractors were already effectively in compliance with the requirements of the Renovation Rule. *See* Economic Analysis for the TSCA Lead Renovation, Repair, and Painting Program, at 5-26 (Mar. 2008) (explaining that, in estimating the benefits of the Renovation Rule, "[t]he baseline against which the regulatory options are compared takes into account current practices"). Accordingly, it appears that EPA was comparing apples to apples after all -- a point the petitioners acknowledged at oral argument. Oral Arg. Recording at 21:24-:44.

In sum, because the petitioners have offered no justification for questioning the reasonableness of EPA's calculation of costs and benefits, we reject this challenge to the removal of the opt-out provision as well.

III

The petitioners' second contention is that EPA violated the Regulatory Flexibility Act (RFA) by failing to convene a small business advocacy review panel to assess the impact of removing the opt-out provision from the Renovation Rule. Section 604 of the RFA generally requires an agency to prepare a final regulatory flexibility analysis when it promulgates a final rule. 5 U.S.C. § 604; *see id.* § 605(b), (c). With exceptions, section 603 of the Act requires the agency to prepare an initial

regulatory flexibility analysis before issuing a notice of proposed rulemaking as well. *Id*. § 603; *see id.* § 605(b), (c). And when an initial flexibility analysis is required, section 609(b) directs the agency to convene a small business advocacy review panel for the purpose of obtaining advice and recommendations about the potential impact of the proposed rule. *Id*. § 609(b). Although EPA convened such a review panel prior to promulgating the original Renovation Rule, it did not do so again before issuing the amended rule. The petitioners claim that this failure violated the RFA.

But the RFA renders this kind of claim unreviewable. Section 611(c) of the RFA provides that "[c]ompliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review *only* in accordance with this section." 5 U.S.C. § 611(c) (emphasis added). Section 611(a)(2) grants this court "jurisdiction to review any claims of noncompliance with sections 601, 604, 605(b), 608(b), and 610." 5 U.S.C. § 611(a)(2); *see id.* § 611(a)(1). The section further provides that "[a]gency compliance with sections 607 and 609(a) shall be judicially reviewable in connection with judicial review of section 604." *Id*. § 611(a)(2); *see id.* § 611(a)(1). Conspicuously absent from these lists of reviewable claims is a claim alleging noncompliance with section 609(b) -- the provision that requires the convening of small business advocacy review panels. Accordingly, as we held in *Allied Local & Regional Manufacturers Caucus v. EPA*, this court "has no jurisdiction to review challenges" to an agency's compliance with that section. 215 F.3d 61, 80 n.21 (D.C. Cir. 2000).

The petitioners urge us to take either of two ways around this jurisdictional impasse.

First, they note that, even if they cannot directly obtain review of agency compliance with section 609(b), the statute does authorize review of compliance with the final regulatory flexibility analysis requirement of section 604. And they maintain that we can regard the "failure to convene a [review] [p]anel" as a failure that "renders the final regulatory flexibility analysis defective." NAHB Reply Br. 16. This argument is foreclosed, however, by section 611(a)(2), which expressly authorizes judicial review of "[a]gency compliance with sections 607 and 609(a) . . . in connection with judicial review of section 604," but does not authorize review of compliance with section 609(b) -- even in connection with a section 604 claim.[4]

Second, the petitioners contend that the failure to convene a review panel is evidence that the agency acted arbitrarily and capriciously in contravention of the APA. It is true that the RFA grants us jurisdiction to review claims of noncompliance with section 604, the final regulatory impact analysis provision, "in accordance with" the APA. 5 U.S.C. § 611(a)(2). It is also true, as we said in *Allied Local*, that although we may not review certain challenges "in terms of the agency's compliance with the RFA, we may consider them in determining whether EPA complied with the overall requirement that an agency's decisionmaking be neither arbitrary nor capricious." 215 F.3d at 79. But the challenges we reviewed in *Allied Local* were unlike the challenge the petitioners raise here. In that case, the allegations were that, in the course of promulgating a rule, the agency had failed to "respond to significant points raised during the comment period" and "consider significant alternatives to

---

[4]Section 607 deals with the preparation of "quantifiable or numerical" analyses in connection with initial and final regulatory impact analyses. 5 U.S.C. § 607. Section 609(a) describes procedures (other than review panels) for ensuring that small entities have an opportunity to participate in rulemakings.

the course it ultimately ch[o]se." *Id*. at 80. Those kinds of failings may best be described as "quasi-procedural" rather than "procedural." "At bottom, they focus not on the kind of procedure that an agency must use to generate a record, but rather on the kind of decisionmaking record the agency must produce to survive judicial review . . . . Their concern is not with the external process by which litigants present their arguments to the agency, but with the internal thought process by which an agency decisionmaker reaches a rational decision. Thus, these requirements can be said to flow not from the APA's procedural dictates, but from its substantive command that agency decisionmaking not be 'arbitrary' or 'capricious.'" Merrick B. Garland, *Deregulation and Judicial Review*, 98 HARV. L. REV. 505, 530 (1985); *see id*. at 510 n.23, 526-31, 545.

The small business advocacy review panel, by contrast, is a purely procedural device, a process by which interested parties can present their views to the agency. *See* Oral Arg. Recording at 41:00-:14 (acknowledgment by petitioners that the absence of a review panel is "a process point," and that they cannot cite any information they could not have presented during the normal notice-and-comment period). And courts may not, under the guise of the APA's arbitrary-and-capricious review standard, impose procedural requirements that the APA's procedural provisions, *e.g.*, APA § 4, 5 U.S.C. § 553, do not themselves impose. *Compare Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (noting that the notice-and-comment procedures prescribed by section 4 of the APA are "the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures"), *with State Farm*, 463 U.S. at 50 (holding that the requirements of explanation and consideration of alternatives do not "impose additional procedural requirements upon an agency" in contravention of *Vermont Yankee*); *see* Garland, *supra*, at 528-30. A fortiori, courts may

not, under the guise of APA review, enforce compliance with a procedural requirement that the RFA clearly excludes from our purview.  It is for this reason that in *Allied Local*, although we did examine the petitioners' claims that EPA had failed to consider significant comments and alternatives, we expressly found the claim that the agency had failed to convene a review panel to be outside our jurisdiction.  215 F.3d at 80 n.21.

IV

The petitioners find EPA's change of heart largely inexplicable, arguing that the "only event of note between the inclusion and removal of the Opt-Out Provision was a settlement agreement which obligated the Agency to undertake certain actions."  NAHB Br. 11-12.  But there were in fact two other events of note, both of which preceded that settlement, that go a long way toward explaining why EPA reconsidered the opt-out provision:  namely, the inauguration of a new President and the confirmation of a new EPA Administrator.

And there's the rub.  As then-Justice Rehnquist wrote in his separate opinion in *State Farm*:  "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.  As long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration."  463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part); *see Chevron*, 467 U.S. at 865 ("[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely on the incumbent administration's views of wise policy to inform its

judgments.").  Because the Amended Renovation Rule remains within those bounds, the petition for review is

*Denied.*