RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CHAMBER OF COMMERCE OF THE UNITED STATES;
BUSINESS ROUNDTABLE; TENNESSEE CHAMBER OF
COMMERCE AND INDUSTRY,

        *Plaintiffs-Appellants*,

    *v.*

SECURITIES AND EXCHANGE COMMISSION; GARY
GENSLER, in his official capacity as Chairman of the
Securities and Exchange Commission,

        *Defendants-Appellees*.

> No. 23-5409

─────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cv-00561—Aleta Arthur Trauger, District Judge.

Argued: October 26, 2023

Decided and Filed: September 10, 2024

Before: GIBBONS, BUSH, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Jeffrey B. Wall, SULLIVAN & CROMWELL LLP, Washington, D.C., for Appellants. Daniel E. Matro, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Appellees. **ON BRIEF:** Jeffrey B. Wall, Elizabeth A. Rose, Leslie B. Arffa, Stephanie M. Kelly, SULLIVAN & CROMWELL LLP, Washington, D.C., Matthew A. Schwartz, SULLIVAN & CROMWELL LLP, New York, New York, for Appellants. Daniel E. Matro, SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Appellees. Donald B. Verrilli, Jr., Elaine J. Goldenberg, MUNGER, TOLLES & OLSON LLP, Washington, D.C., Virginia Grace Davis, MUNGER, TOLLES & OLSON LLP, San Francisco, California, Christopher A. Bates, OFFICE OF THE UTAH ATTORNEY GENERAL, Salt Lake City, Utah, Paul W. Hughes, MCDERMOTT WILL & EMERY LLP, Washington, D.C., Jonathan F. Cohn, LEHOTSKY KELLER COHN LLP, Washington, D.C., for Amici Curiae.

GIBBONS, J., delivered the opinion of the court in which DAVIS, J., concurred.  BUSH, J. (pp. 23–41), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge.   The United States Chamber of Commerce, Business Roundtable, and the Tennessee Chamber of Commerce and Industry sued the Securities and Exchange Commission and its Chairman, alleging that the Commission's partial rescission of a prior regulation failed to meet the procedural and substantive demands of the Administrative Procedure Act.  The district court granted summary judgment to the Commission, and we affirm.

I.

A.

Under state law, shareholders of public companies enjoy the right to vote their shares at annual shareholder meetings on a variety of corporate governance issues, including the election of board members, the approval or disapproval of proposed mergers and acquisitions, and the implementation of environmental-, social-, and governance-related initiatives.  In recent years, this theoretically simple process has grown increasingly complex.  The range of issues subject to shareholder approval has expanded, and in turn, the range of issues on which shareholders must educate themselves has grown in equal measure.  Further complicating matters, institutional investors like broker-dealers and mutual funds have amassed an increasingly large share of the market for publicly traded companies.  Because these institutional investors today hold millions of shares in scores of companies, they must cast votes at "potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year."  Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice ("2019 Proposed Rule"), 84 Fed. Reg. 66518, 66519 (Dec. 4, 2019).  To make matters even more difficult, most of these votes are condensed into an approximately three-month period from mid-March to early June each year.  Concept Release on the U.S. Proxy System ("2010 Concept Release"), 75 Fed. Reg. 42982, 43009 (July 22, 2010).  During that interval, institutional

investors must organize voting materials, study their portfolio companies and the proposals slated for a vote, catalogue the many votes they need to cast, and ultimately submit votes for counting.

One partial solution to these complexities is the widespread use of proxy voting, under which shareholders forgo attending annual company meetings in person and instead participate and vote through proxies. Exemptions From the Proxy Rules for Proxy Voting Advice ("2020 Rule"), 85 Fed. Reg. 55082, 55082 (Sept. 3, 2020). Under this "proxy voting" system, state law authorizes shareholders to appoint a third party (a "proxy") who is empowered to vote their shares on their behalf at shareholder meetings. The major national securities exchanges like the New York Stock Exchange and the Nasdaq facilitate proxy voting by "generally requir[ing] their listed companies to solicit proxies for all meetings of shareholders." 2010 Concept Release, 75 Fed. Reg. at 42,984. And given what is now near-ubiquitous use of proxy voting, the proxy solicitation process has "become *the* forum for shareholder suffrage." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 422 (D.C. Cir. 1992) (emphasis added) (quoting Proposed Amendments to Rule 14a–8, Exchange Act Release No. 19135, 47 Fed. Reg. 47420, 47420–21 (Oct. 26, 1982)).

Yet proxy voting is not a panacea, and many of the logistical and substantive challenges of voting at shareholder meetings remain. So Proxy Voting Advice Businesses, or PVABs, the focus of the instant litigation, play a role in the process. PVABs help institutional investors by "manag[ing] their substantive and procedural proxy voting needs," primarily through the voting recommendations that they curate and sell. 2020 Rule, 85 Fed. Reg. at 55083. Substantively, PVAB voting recommendations assist institutional investors by substituting for the research and analysis that investors would otherwise be required to undertake themselves when voting on thousands of shareholder proposals. Procedurally, PVABs take their voting recommendations a step further by offering to "[a]ssist[] with the administrative tasks associated with voting," including casting their clients' votes on their behalf (like ordinary proxies) and, if desired, automatically casting votes aligned with PVAB recommendations. *Id.* at 55,123.

The influence of PVAB recommendations in the proxy solicitation process is considerable.[1] Yet the rise of PVABs itself presents challenges for the proxy voting system: first, PVABs' relationships with public companies and investors often create conflicts of interest. Second, PVABs' advice sometimes contains inaccurate information, although the prevalence of errors is disputed. Companies that identify an inaccuracy or mischaracterization in PVAB advice have little time to notify investors during the weeks between investors' receipt of the recommendation and the shareholder meeting.

These difficulties intersect with the Commission's regulatory ambit because proxy voting advice is considered a form of "proxy solicitation" subject to regulation under the Exchange Act of 1934. Section 14(a) of the Exchange Act delegates the regulation of proxy solicitations to the SEC and provides that it is "unlawful for any person . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors to solicit any proxy . . . in respect of any [registered] security." 15 U.S.C. § 78n(a)(1) (2022). The Commission in turn imposes procedural and substantive requirements on proxy solicitors by requiring certain public disclosures and prohibiting false statements or omissions in proxy statements. 17 C.F.R. § 240.14a-3–15, 14a-19 (2022). Because the SEC has informally recognized that PVAB advice constitutes a "solicitation" under the Exchange Act, the advice is governed by Rule 14a-9's prohibition of false and misleading statements. However, PVABs have historically avoided Rule 14's procedural and substantive requirements by qualifying for an exemption under Rule 14a-2(b)(1) or (b)(3).

Over the course of the 2010s, the SEC undertook a "comprehensive review of the proxy voting infrastructure." Mary L. Schapiro, *Speech by SEC Chairman: Opening Statement at the SEC Open Meeting* (July 14, 2010), https://www.sec.gov/news/speech/2010/spch071410mls.htm. In 2010, the Commission issued a concept release seeking public comment about "the role and legal status of proxy advisory firms within the U.S. proxy system"; in 2013 and 2018, the

---

[1]Additionally, the PVAB market is unique in that there are only two dominant firms in the United States. Institutional Shareholder Services and Glass Lewis & Co. together control approximately 97% of the market. The concentration of the PVAB market in these two firms significantly influences corporate decision-making: for example, in a study of "175 asset managers with more than $5 trillion in assets under management," managers "historically voted with ISS on both management and shareholder proposals more than 95% of the time." DE 35-5, Rose & Walker Comment on Proposed Proxy Voting Advice Amendments, Page ID 405 n.16.

Commission hosted roundtables to discuss the role of PVABs in 2013 and 2018; and in 2014, the Commission issued a legal bulletin clarifying how PVABs may qualify for exemptions under Rule 14a2(b). Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice, 84 Fed. Reg. 47416-01, 47416 (Sept. 10, 2019).

In December 2019, the SEC released a Notice of Proposed Rulemaking amending the application of the proxy rules to PVABs. The SEC explained that the regulation would "enhance the accuracy, transparency of process, and material completeness of the information provided to clients of [PVABs] . . . [and would] enhance disclosures of conflicts of interest that may materially affect [PVAB] voting advice." 2019 Proposed Rule, 84 Fed. Reg. at 66,520. Notice of the proposed rules was published to the Federal Register on December 4, 2019, and the SEC provided 60 days for public comment. The SEC received 650 comments on the proposed regulation, and Commission staff held 84 meetings with interested parties.

By a three-to-one vote, the SEC adopted an amended version of its proposed regulation in September 2020, with the effect of implementing the Rule's three key provisions. First, the 2020 Rule codified the SEC's informal view that PVAB advice constitutes a "solicitation" under Section 14(a) of the Exchange Act. Second, the Rule provided two conditions that PVABs must meet to gain exemption from Rule 14a's filing and information requirements. Under the first condition, PVABs had to "include in their voting advice to clients [certain] conflicts of interest disclosure[s]" (the "Conflict-disclosure Condition"). 2020 Rule, 85 Fed. Reg. at 55,098. Under the other condition, PVABs were required to "adopt policies and procedures reasonably designed" to notify companies of their advice "at or prior to the time when such advice is disseminated to [PVAB] clients," and to "provide clients with a mechanism by which they can reasonably be expected to become aware of any written response" by a company (the "Notice-and-Awareness Conditions). *Id.* at 55,117. Finally, the 2020 Rule added an explanatory note (Note (e)) to Rule 14a-9, which provided examples of material misstatements that were prohibited under Rule 14a-9. *Id.* at 55,155.

The SEC acknowledged that compliance with the 2020 Rule would burden PVABs. However, the Commission concluded that any burdens of the regulation were outweighed by its benefits, emphasizing that the Notice-and-Awareness Conditions would increase transparency

and "facilitate[e] the ability of clients of [PVABs] to make informed voting determinations," which would "ultimately lead to improved investment outcomes." *Id.* at 55,142. The 2020 Rule also reflected certain changes made in response to commenter concerns. In the 2019 Proposed Rule, the Commission had initially considered requiring PVABs to share voting advice with companies before sending it to their clients, so that companies could have "time to review and provide feedback on the advice" (the "Pre-Dissemination Requirement"). 2019 Proposed Rule, 84 Fed. Reg. at 66,531. Several commenters opposed that requirement because sharing proposed recommendations with companies prematurely could compromise PVAB independence and cause delays. Based on that feedback, the SEC amended the Notice-and-Awareness Conditions to require that PVABs notify companies at the same time they provide advice to their clients. Additionally, recognizing that "the burden [on PVABs] would be greatest in the first year after adoption," the Commission proposed delaying enforcement of the rule until December 1, 2021. *Id.* at 66,554.

After an administration change, Gary Gensler assumed the office of SEC Chair in April 2021. On June 1, 2021, Chair Gensler issued a statement directing the Commission to "revisit" the 2020 Rule, and the Commission's Division of Corporate Finance announced on the same day that it would "not recommend enforcement action based on [the 2020 Rule while] . . . the Commission is considering further regulatory action in this area." SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rules 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021), https://www.sec.gov/news/public-statement/corp-fin-proxy-rules-2021-06-01. On June 11, 2021, Chair Gensler held a closed-door meeting with several groups who "expressed concerns about the costs associated" with the regulation. Proxy Voting Advice ("2021 Proposed Rescission"), 86 Fed. Reg. 67383, 67386 (Nov. 26, 2021).

On November 17, 2021, the SEC proposed amending the 2020 Rules by (1) removing the Notice-and Awareness-Conditions and (2) removing explanatory Note (e) to Rule 14a-9. The Commission also proposed rescinding supplemental guidance that clarified application of the 2020 Rule. The Commission explained that the revisions did "not represent a wholesale

reversal" of the 2020 Rule, but instead were "tailored adjustments" responding to concerns about the prior regulation. *Id.* at 67384.

Notice of the 2021 Proposed Rescission was published in the Federal Register on November 26, 2021, and the deadline to submit comments was 30 days later, December 27, 2021. Several interested parties, including the CEO of the American Securities Association, Senator Pat Toomey, and Congressman Patrick McHenry expressed concerns about the brief comment period and requested that the Commission extend the deadline. Their requests were denied. Ultimately, the Commission received 61 comments on the proposed 2022 Rescission and held three meetings with interested parties.

The SEC adopted the amendments to the 2020 Rule, as proposed, on July 13, 2022, by a 3-2 vote. In the accompanying release, the Commission stated that it had "revisited [its] analysis" in the 2020 Rule and was "now striking a different and improved policy balance." Proxy Voting Advice ("2022 Rescission"), 87 Fed. Reg. 43168, 43170 (July 19, 2022). The Commission explained that it removed the Notice-and-Awareness Conditions because they "d[id] not sufficiently justify the risks they pose to the cost, timeliness, and independence of proxy voting advice." *Id.* Its decision was made, in part, due to comments from PVAB clients who were concerned about the impact of the conditions. The Commission further reasoned that the conditions were largely unnecessary in light of voluntary PVAB practices that "provid[e] PVAB clients with some of the benefits that those conditions were expected to produce while avoiding the potentially significant associated costs." *Id.* It discounted concerns that rescinding the conditions would prevent PVAB clients from discovering inaccuracies in proxy advice, noting that it was not convinced that errors in PVAB advice "establish[ed] the necessity" of the conditions. *Id.* at 43,176

The SEC also discussed the estimated burdens and benefits of the 2022 Rescission. The Commission relied on the estimated compliance burdens presented in the 2020 Rule and concluded that the 2022 Rescission would, "at a minimum, eliminate these estimated PRA burdens, which took into consideration that some PVABs may have systems and practices in place that could substantially mitigate any overall burden increases." *Id.* at 43,186. Similarly, it cited the estimated paperwork burdens resulting from the 2020 Rule and predicted that the partial

rescission would cause those burdens to "decrease . . . by the same amount." *Id.* at 43192. It acknowledged, however, that at bottom it was "unable to quantify the full range of PVABs' costs resulting from the [2020 Rule], which would vary depending on each PVAB's current practices and how they implement the new conditions." *Id.* at 43,186.

The Commission recognized that rescinding the Notice-and-Awareness Conditions would burden companies "by potentially reducing the overall mix of information available to [PVAB] clients as they assess proxy voting advice and make determinations about how to cast their votes." *Id.* at 43,187. It acknowledged that any costs "may be mitigated, however, by the practices and standards that PVABs have voluntarily adopted." *Id.*

B.

The United States Chamber of Commerce, Business Roundtable, and the Tennessee Chamber of Commerce and Industry (collectively, the "plaintiffs") filed this action in July 2022. They claim that the Commission violated the APA's procedural and substantive requirements when it adopted the 2022 Rescission. Relevant to this appeal, the plaintiffs allege that the SEC violated the APA's procedural demands when it allowed only 31 days for public comment on the 2022 Rescission. Their remaining counts on appeal allege that the Commission's reasoning for the 2022 Rescission was substantively deficient in two respects—namely, (1) that its explanation for the rule was arbitrary and capricious and (2) that it failed to analyze the rule's economic consequences, in violation of the Exchange Act.

On cross-motions for summary judgment, the district court granted summary judgment to the defendants. The district court explained that even if the shortened comment period was "somewhat troubling," it was nonetheless legally permissible under the APA and Supreme Court precedent. *Chamber of Com. v. SEC*, 670 F. Supp. 3d 537, 552 (M.D. Tenn. 2023). The court also held that the Commission's decision to rescind the Notice-and-Awareness Conditions was not arbitrary and capricious. It determined that the APA did not require the Commission to provide an analysis of similar length to its 2020 analysis, and that the Commission reasonably explained its change in policy by identifying that the benefits of the Notice-and-Awareness Conditions were outweighed by their costs. Finally, the district court rejected the plaintiffs'

Exchange Act claim, finding that the Commission adequately compared the benefits of the Notice-and-Awareness Conditions to its compliance burdens.  Plaintiffs timely appealed.

## II.

When a district court grants summary judgment and upholds agency action under the APA, we review its decision de novo.  *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007).  The APA instructs that this court must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this "deferential" standard, "[a] court simply ensures that the agency . . . has reasonably considered the relevant issues and reasonably explained the decision."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned."  *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022) (quotation omitted).  Part and parcel to this review is ensuring that the agency complied with the APA's procedural requirements.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).  So, if an agency acted "without observance of procedure required by law," its action must also be set aside.  5 U.S.C. § 706(2)(D).

## A.

We begin with the substantive element of the 2022 Rescission, which the plaintiffs contend was arbitrary and capricious (because it represented an unexplained about-face from the Commission's 2020 Rule) and not in accordance with law (because it failed to adequately assess economic costs and benefits as required under the Exchange Act).

## 1.

The APA provides that courts should set aside any agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this standard, the agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut.*

*Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).   A court evaluating the substance of an agency action may not "substitute its judgment for that of the agency," *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 16 (2020) (quotation omitted), and it should vacate a challenged regulation only if it "had no rational basis or . . . it involved a clear and prejudicial violation of applicable statutes or regulations." *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987).

In *FCC v. Fox Television Stations, Inc.*, the Supreme Court clarified that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action."  556 U.S. 502, 514–15 (2009).  For an action representing a policy change to survive arbitrary-and-capricious review, the agency need not demonstrate that "the reasons for the new policy are *better* than the reasons for the old one."  *Id.* at 515.  Instead, the agency must show that "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.* The agency must also "display awareness that it *is* changing position."  *Id.*

The 2022 Rescission satisfied *Fox*'s requirements.  The Commission candidly recognized that the 2022 Rescission constituted a shift from the approach it had taken in 2020.  And it acknowledged that although the SEC had previously found that the benefits of the 2020 Rule outweighed its costs, it now "weigh[ed] these competing concerns differently."  2022 Rescission, 87 Fed. Reg. at 43175.   The Commission also identified "good reasons" for the change in position.  *Fox*, 556 U.S. at 515.  It stated that it reconsidered its prior rulemaking due to PVAB clients' concerns that the Notice-and-Awareness Conditions "would have adverse effects on the cost, timeliness, and independence of proxy voting advice."  2022 Rescission, 87 Fed. Reg. at 43,169.  The Commission further noted that it was no longer convinced that the prevalence of errors in proxy voting advice justified the Notice-and-Awareness Conditions, but that to the extent there were errors, rescinding the Conditions would not affect companies' ability to "identify [] issues and respond [to proxy voting advice] using pre-existing mechanisms."  *Id.* at 43,176.  Finally, the Commission fully explained why it believed that rescinding the Notice-and-Awareness Conditions would ameliorate burdens on PVABs without negatively impacting the quality of proxy advice or efficiency of the proxy system.   Its thoughtful and thorough

explanation of these considerations was "hardly arbitrary and capricious." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038–39 (D.C. Cir. 2012) (finding the repeal of a regulation was not arbitrary and capricious where the agency explained that the prior rule "did not sufficiently account for" countervailing factors and that the amended rule "promotes, to a greater extent, [its] statutory directive" (cleaned up)).

Nothing the plaintiffs assert changes this analysis. The Commission did not act arbitrarily merely because the 2022 Rescission immediately followed a change in administration. As the Supreme Court has recognized, an agency may rescind a prior rule based solely on a change in the agency's policy preferences, so long as the change is reasonably explained. *See State Farm*, 463 U.S. at 43. Nor did the Commission err by relying on the same set of facts that gave rise to the 2020 Rule. Indeed, administrative agencies are free to reevaluate old facts to reach new policy conclusions. *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1038 (recognizing that "*Fox* makes clear that this kind of reevaluation is well within an agency's discretion"); *see also Organized Vill. of Kake v. USDA*, 795 F.3d 956, 968–69 (9th Cir. 2015) (acknowledging that the agency "was entitled in 2003 to give more weight to socioeconomic concerns than it had in 2001, even on precisely the same record"). Accordingly, the SEC's reliance on "precisely the same record" was not arbitrary or capricious, particularly given that it explained why its reevaluation of the competing factors was more effective in 2022 than it had been in 2020. *See Organized Vill.*, 795 F.3d at 968–69.

That the 2022 Rescission did not equal the 2020 Rule in length is a similarly deficient reason to declare the 2022 regulation arbitrary and capricious. *See Fox*, 556 U.S. at 514 (noting that the Court has "neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance"). As the district court correctly observed, the Commission was not writing on a blank slate when issuing the 2022 Rescission. It had discussed the same factual and regulatory background when promulgating the 2020 Rule, it is indeed "unremarkable that [the 2022 Rescission] would, therefore, include significantly less background discussion." *Chamber of Com.*, 670 F. Supp. 3d at 554. In fact, page length is itself an entirely arbitrary metric by which to judge the quality of an agency rule, and the Supreme Court has wisely instructed that we

should instead focus on whether we can "reasonably . . . discern[]" the Commission's logical path. *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Encino v. Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (finding that a policy change was arbitrary and capricious where the agency provided only "conclusory statements" and "gave almost no reasons at all" for the change). Because we can do so here, the Rescission's word count is of no moment in our analysis.

Finally, although *Fox* requires that an agency provide a more detailed explanation for decisions that either threaten the "serious reliance interests" generated by a prior policy or "disregard" the "facts and circumstances" supporting an earlier regulation, neither of these concerns are at play in this case. 556 U.S. at 516. The 2020 Rule did not engender serious reliance interests because the regulation had not gone into effect at the time Chair Gensler halted enforcement of the regulation in 2021. And the SEC was not required to provide a more thorough explanation of the facts supporting the 2022 Rescission because the Commission did not alter or disregard the factual findings underlying the 2020 Rule.

The district court thought otherwise, finding that the Commission in fact changed its "understanding of the relevant factual circumstances" when it rebalanced the "various costs and benefits" of the 2020 Rule. *Chamber of Com.*, 670 F. Supp. 3d at 557. But this finding misunderstands the nature of the Commission's 2022 Rescission. As several courts have recognized, an agency may "reevaluat[e]" its position with respect to the weight it assigns to countervailing facts without making new factual findings, *see, e.g.*, *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038, and that is precisely what occurred here. The Commission struck a balance between regulatory burdens and benefits when it promulgated the 2020 Rule, and it thought better of that same balance when issuing the 2022 Rescission. *See* 2022 Rescission, 87 Fed. Reg. at 43175 ("We weigh these competing concerns differently today . . ."). The APA does not authorize us to second-guess that policy choice.

The plaintiffs' efforts to paint the Commission's policy choice as a factual reversal fail to persuade. They first argue that the Commission found contradictory facts because the 2022 Rescission stated that the Notice-and-Awareness Conditions posed a risk of "adverse effects on the cost, timeliness, and independence of proxy voting advice," *Id.* at 43169, while the 2020 Rule

claimed that those same Conditions "d[id] not create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted," 2020 Rule, 85 Fed. Reg. at 55112. But this ostensible contradiction in fact arises from selective quotation.  Stated in full, the 2020 Rule found that the Notice-and-Awareness Conditions, as adopted, "d[id] not create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted *as a result of a* [company's] *pre-dissemination involvement*."  *Id.* (emphasis added).  In other words, because the final 2020 Rule eliminated the Pre-Dissemination Requirement that the Commission had included in its 2019 Proposed Rule, the Commission found that the Pre-Dissemination Requirement no longer posed risks to the timeliness and independence of proxy voting advice. *Id.*  This finding said nothing about the risks posed by the Notice-and-Awareness Conditions that remained in the 2020 Rule, which required PVABs to provide notice to registrants *concurrent with* their dissemination of proxy voting advice.  The plaintiffs' effort to manufacture a contradiction on this issue is misleading at best.

The plaintiffs also claim that the Commission changed its factual views on "the effectiveness of PVAB voluntary practices."  CA6 R. 15, Appellant Br., at 50–52.  However, as with the prior claim, there is no factual inconsistency between the Commission's statements in 2020 and 2022.  In the 2020 Rule, the SEC explained that it "d[id] not believe" that PVABs' current practices were "alone sufficient" to ensure that companies received proxy advice in a timely manner.  2020 Rule, 85 Fed. Reg. at 55108.  By contrast, it concluded in 2022 that those same voluntary practices would allow for "some of the opportunities and access to information" provided by the Notice-and-Awareness Conditions.  2022 Rescission, 87 Fed. Reg. at 43171. Those statements are not contradictory factual findings, but differing judgments on the value of PVABs' self-regulation.  In 2020, the SEC took the position that voluntary practices were not of sufficient value to compensate for the Notice-and-Awareness Conditions; two years later, it found that the value of those practices did compensate for the Conditions.  Because the Commission's change of opinion does not amount to a contradictory factual finding, it was not required to provide a more thorough explanation under *Fox.*  556 U.S. at 515.

In sum, the 2022 Rescission was not arbitrary and capricious because the Commission acknowledged that it was changing course, provided good reasons for the change, and explained

why it believed that its new rule struck a "different and improved policy balance." 2022 Rescission, 87 Fed. Reg. at 43170. Moreover, the Commission was not required to provide a more thorough explanation because the 2022 Rescission did not rest upon factual findings contrary to the findings contained in the 2020 Rule.

2.

Plaintiffs next argue that the 2022 Rescission was adopted in a manner "not in accordance with law," 5 U.S.C. § 706(2)(A), because the SEC failed to adequately analyze the economic consequences of the 2022 Rescission as required under the Exchange Act. *See* 15 U.S.C. § 78c(f). We find that this complaint is equally unfounded.

The Exchange Act provides that "[w]henever . . . the Commission is engaged in rulemaking" it has a unique duty to "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (stating that the Exchange Act requires that the SEC "apprise itself — and hence the public and the Congress — of the economic consequences of a proposed regulation" (quoting *Chamber of Com. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005))). While the Exchange Act does not require that the SEC "base its every action upon empirical data," the Commission must, at a minimum, "determine as best it can the economic implications of the rule it has proposed." *Chamber of Com.*, 412 F.3d at 142; *see also Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1221 (D.C. Cir. 2004) (recognizing that the agency must "exercise its expertise to make tough choices about which of the competing estimates is most plausible, and to hazard a guess as to which is correct, even if . . . the estimate will be imprecise").

Here, the Commission adequately estimated the benefits of rescinding the Notice-and-Awareness Conditions. It explained that the 2022 Rescission would benefit PVABs by reducing the "direct costs associated with modifying their current systems and methods" to comply with the Notice-and-Awareness Conditions. 2022 Rescission, 87 Fed. Reg. at 43186. It also noted that to the extent increased compliance costs "could be passed on to [PVAB] clients," rescinding the Conditions could also benefit clients by "revers[ing] those increases," which would lead to

"greater efficiencies in the proxy voting process" and increased demand for PVAB advice. *Id.* at 43189. Relying on its prior analysis, the Commission reasonably explained how the benefits of rescinding the Notice-and-Awareness Conditions would affect efficiency and competition in the market. That reasonable explanation was sufficient for purposes of the Exchange Act.

Plaintiffs claim that the Commission should not have relied on data collected in anticipation of the 2020 Rule when assessing the benefits of the 2022 Rescission, but as the district court correctly noted, "[n]othing about 15 U.S.C. § 78c(f) required the SEC to forget that its earlier analysis ever happened." *Chamber of Com.*, 670 F. Supp. 3d at 555. Instead, because the Commission had already estimated the cost of complying with the 2020 Rule, it was entitled to rely on that analysis and infer the benefits of a partial rescission accordingly. *See Chamber of Com.*, 412 F.3d at 144 (recognizing that "depending upon the nature of the problem, an agency may be 'entitled to conduct ... a general analysis based on informed conjecture'" (quoting *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998))).

Additionally, the Commission's discussion of the mitigating effects of PVAB voluntary practices was not inherently contradictory. The Commission recognized that rescinding the Notice-and-Awareness Conditions would benefit PVABs by reducing compliance costs, although it acknowledged that any benefits "would vary depending on each PVAB's current practices and how they implement the new conditions." 2022 Rescission, 87 Fed. Reg. at 43,192. That recognition mirrors the Commission's statement in 2020 that PVABs could "leverage their existing practices" to "reduc[e] compliance burdens" associated with the notice-and-awareness conditions. 2020 Rule, 85 Fed. Reg. at 55,140. By acknowledging the effects of PVABs voluntary practices, the Commission was not assuming that the Rescission would save PVABs "every dollar imposed on them by the 2020 Rule[s]." CA6 R. 15, Appellant Br. at 56. Instead, the Commission provided a more holistic account of the consequences of rescission and explained why its estimate of benefits was "imprecise." *Pub. Citizen*, 374 F.3d at 1221*; Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (upholding regulation where SEC explained that "[s]everal factors could mitigate" the risks of its rule); *Chamber of Com.*, 412 F.3d at 143 (recognizing that when multiple variables affect the costs of compliance, the SEC may be

capable of "determin[ing] only the range within which a [participant's] cost of compliance will fall").

The Commission also adequately assessed the costs of the Rescission. The SEC stated that rescinding the Notice-and-Awareness Conditions could "potentially reduc[e] the overall mix of information available to [PVAB] clients as they assess proxy voting advice." 2022 Rescission, 87 Fed. Reg. at 43196. The Commission also acknowledged that rescission could "limit a [company's] ability to timely identify errors and mischaracterizations in proxy voting advice," and that companies may instead be required to "solely rely upon internal resources to research, analyze, and execute proxies." *Id.* at 43,187–88. The qualitative assessment was sufficient, given that the Commission lacked data enabling it to conduct a quantitative analysis.

The plaintiffs claim that the SEC's assessment of costs was insufficient because the Commission did not attempt to quantify the costs to PVAB clients. They contend that the Commission's statement that the Rescission could potentially reduce the variety of information available to investors is too vague to satisfy the Exchange Act. Additionally, they claim that the Commission could have provided a more concrete analysis by thoroughly addressing the prevalence of errors in PVAB advice or gathering additional data on the costs that companies incur in attempting to correct those errors. However, the SEC's qualitative analysis of costs was sufficient because the potential costs that the plaintiffs identify are not easily quantified. *See Lindeen*, 825 F.3d at 658 (noting that Commission was not required to "conduct a rigorous, quantitative economic analysis of every potential cost and benefit" to satisfy Exchange Act requirements (quotation omitted)).

As the Commission explained in 2020, the purported benefit of the Notice-and-Awareness Conditions was to increase transparency in the proxy voting system, which would "facilitate[e] the ability of clients of [PVABs] to make informed voting determinations" and "ultimately lead to improved investment outcomes." 2020 Rule, 85 Fed. Reg. at 55,142. The value of informed decisionmaking is not a benefit that can be readily quantified, but instead lends itself to a qualitative analysis. Just as the Commission qualitatively assessed the value of informed decisionmaking that resulted from the Notice-and-Awareness Conditions in 2020, it was equally entitled to rely on its qualitative assessment of the predicted "reduc[tion] [in] the

overall mix" of information resulting from the 2022 Rescission. *See Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369 (D.C. Cir. 2014) (finding that agency was not required to quantify "compelling social benefits" resulting from regulation where "doing so would be pointless because the costs of the rule—measured in dollars—would create an apples-to-bricks comparison").

Moreover, as the district court recognized, it is not clear that the additional data the plaintiffs request would have permitted the Commission to assign a number to the costs of rescission. *See Chamber of Com.*, 670 F. Supp. 3d at 555. *But see Bus. Roundtable*, 647 F.3d at 1150 (finding Exchange Act analysis insufficient where agency "did nothing to estimate and quantify the costs it expected companies to incur; nor did it claim estimating those costs was not possible, for empirical evidence . . . was readily available"). Even if the parties could establish with certainty the prevalence of errors in proxy advice during a given year, that number would not impact the Commission's cost assessment because companies respond to erroneous advice with or without the Notice-and-Awareness Conditions. *See* 2019 Proposed Rule, 84 Fed. Reg. at 66,533 (recognizing that companies "are able, under the existing proxy rules, to file supplemental proxy materials to respond to . . . proxy voting recommendations and to alert investors to any disagreements they have identified with a [PVABs'] voting advice"). And because companies respond to erroneous advice regardless, it is not clear why the resources spent preparing their responses should count as a cost of rescission. Plaintiffs have not established how compiling data on these factors would enable the Commission to quantify the costs of rescission.

In sum, the district court correctly held that the Commission's economic analysis satisfied the Exchange Act. The SEC properly relied on the compliance burdens established in the 2020 Rule when evaluating the benefits of rescinding the Notice-and-Awareness Conditions, and its assessment was not inconsistent for acknowledging the mitigating effects of current PVAB practices. The Commission's analysis of costs was also reasonable given that the nature of the costs of rescission do not support a quantitative assessment.

B.

We are left with the plaintiffs' purely procedural objection, which complains that the thirty-one-day comment period accompanying the 2021 Proposed Rescission failed to provide interested parties with a meaningful opportunity to comment, as required under the APA. Because accepting this argument would require holding the Commission to an erroneously heightened procedural standard, we decline to vacate the 2022 Rescission on such grounds.

The APA sets forth no minimum duration over which executive agencies must solicit public comment, instead requiring that the public's opportunity to comment be a "meaningful" one. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). Under that standard, courts by and large accept thirty-day comment periods as procedurally sound absent extenuating circumstances. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019); *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 347 (5th Cir. 1990); *see also Fleming Cos. v. USDA*, 322 F. Supp. 2d 744, 764 (E.D. Tex. 2004) ("[A] thirty-day notice and comment period is sufficient."), *aff'd*, 164 F. App'x 528 (5th Cir. 2006); *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 534 (D.C. Cir. 1982) (30-day comment period for "technical[ly] complex[]" rules satisfied the APA).

Here, as the SEC points out, the plaintiffs critique the thirty-one-day comment window accompanying the 2021 Proposed Rescission as insufficient without identifying a party that would have commented or a substantive argument that would have been made had the comment window been longer. Instead, the plaintiffs argue that thirty-one days proved inadequate because of largely formalistic and arbitrary considerations. Yet the cases that the plaintiffs cite prove readily distinguishable, and the augmented explanation that they demand from the SEC is simply not required by the APA. We fully concur with the district court's reasoning in rejecting the plaintiffs' arguments on this issue, and we expand upon that explanation only to underscore a few important points.

First, the plaintiffs analogize this suit to the administrative agency rescissions that the Fourth Circuit and the Northern District of California found procedurally invalid in *North Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755 (4th Cir. 2012), and *Becerra v. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019). But while superficially

compelling, such comparisons ultimately prove inapt, and a close reading of the above two cases reveals that the primary procedural shortcoming animating the Fourth Circuit's and the Northern District of California's decisions is absent here.

In *Carolina Growers* and *Becerra*, as here, the agency's rescission of an earlier rule featured a comment window shorter than the window that accompanied the initial rulemaking. In *Carolina Growers*, the original rule provided for a sixty-day comment window while the rescission allowed for only ten days of comments.  702 F.3d at 770.  In *Becerra*, the original rulemaking provided for 120 days of comments and the rescission allowed for only thirty.  381 F. Supp. 3d at 1176–77.  In both suits, the court highlighted this disparity as a factor that weighed in favor of finding the challenged rulemaking process procedurally deficient.  *See Carolina Growers*, 702 F.3d at 770; *Becerra*, 381 F. Supp. 3d at 1176–77.  Given that the SEC's 2020 Rule provided for a sixty-day comment period and the 2022 Rescission allowed for only thirty-one days of comments, *Carolina Growers* and *Becerra* would thus seem to counsel in favor of vacating the Rescission as procedurally defective.

A closer reading, however, reveals that the lack of parity between initial and subsequent comment periods, while "underscor[ing]" or "further . . . support[ing]" those court's conclusions, was not the procedural shortcoming that either the Fourth Circuit or the Northern District identified as incompatible with the APA.  *Carolina Growers*, 702 F.3d at 770; *Becerra*, 381 F. Supp. 3d at 1176.  Instead, the feature of the challenged rescissions that ran afoul of the APA in both *Carolina Growers* and *Becerra* was the agency's imposition of content restrictions on the comments that interested parties could submit during the comment window.  In *Carolina Growers*, the Department of Labor "prevent[ed] any discussion of the 'substance or merits' of either [the initial rule or its recission]" by instructing commenters that it "would only consider comments concerning the suspension action itself, and not regarding the merits of either set of regulations."  702 F.3d at 761, 770.  In *Becerra*, the Office of Natural Resources Revenue "effectuated a *de facto* [content restriction] by deferring consideration of substantive comments regarding the regulations at issue" to a separate notice of proposed rulemaking, which had the practical effect of segregating germane comments from the rescission on which they substantively opined.  381 F. Supp. 3d at 1176.  These content restrictions loomed large in the

courts' analyses; indeed, they were the chief procedural shortcoming that both courts identified. Here, on the other hand, the Commission imposed no content restriction on the comments that it solicited. The plaintiffs' effort to analogize the instant case to *Carolina Growers* and *Becerra* therefore lacks persuasive force.[2]

The plaintiffs further argue that the Commission's thirty-one-day comment period proved procedurally flawed where it "violated the Commission's and the Executive Branch's own declared policies." CA6 R. 15, Appellant Br., at 35. The first half of this contention rests on a false premise, as the plaintiffs misconstrue the testimony on which they rely for the proposition that the SEC, as a policy, provides sixty days for comment on proposed rules. The plaintiffs characterize Chair Gensler's testimony to Congress as stating that the Commission "'always' provides 'at least two months' to comment on rule proposals." CA6 R. 15, Appellant Br., at 44. Yet a brief review of the quoted testimony makes clear what Chair Gensler intended to communicate—namely, that the SEC strives to publish proposed rules *on its website*, not the federal register, at least sixty days prior to the comment deadline. Nothing in Chair Gensler's testimony intimates that the SEC maintains a sixty-day comment period as a policy.

As to the second half of the plaintiffs' contention, the SEC correctly notes that it need not specifically explain a departure from the executive branch's non-binding recommendation that "significant regulatory actions" allow for a comment period of at least sixty days. DE 35-30, Admin. Conf. U.S. Recommendation, Page ID 791. And in any event, the Commission in fact provided a reason for the thirty-one-day comment window: "the targeted nature" of the 2022 Rescission, which withdrew only select elements of the multifaceted 2020 Rule. 2022 Rescission, 87 Fed. Reg. at 43173 n.71. Thus, the argument that the SEC failed to offer any explanation for the departure from executive branch policy falls flat. And further, in

---

[2]Even taking the plaintiffs' cited cases at face value, their facts are distinguishable from the instant case. In *Carolina Growers*, the recessional rule's comment window ran for one-sixth the duration of the initial rulemaking; in *Becerra*, that fraction equaled one-fourth. Here, the latter comment period ran for just over half the length of the original rule's comment window. Thus, to the extent that parity between initial and subsequent rulemaking is relevant, the comment windows in this case sit on more equal footing than those in *Carolina Growers* and *Becerra*. Moreover, the ten-day comment window provided for in *Carolina Growers* fell twenty days short of the APA's widely acknowledged, albeit uncodified, thirty-day minimum, further distancing that suit's facts from the facts at issue here. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019) (60-day comment period was "twice the APA minimum of 30 days").

response to the argument that the Commission's justification for its shortened comment period proved inadequate, the district court correctly observed that "[P]laintiffs' own briefing . . . makes an overwhelming case that the parties on all sides of these issues were well-prepared to comment quickly and effectively" on the proposed rescission, particularly given the extensive process that accompanied the initial regulation and the "detailed arguments in favor of and against the [regulation]" that "had already been assembled." *Chamber of Com.*, 670 F. Supp. 3d at 553. Here, as at every turn, the district court properly redirected the plaintiffs' formalistic objections concerning the quantity of days in the comment period towards the more suitable subject of concern: the substantive quality of the comments that that thirty-one-day window allowed.

Finally, we also see no merit to the plaintiffs' contention that because "several parties requested that the Commission extend the comment period," the Commission's failure to do so amounted to procedural error. CA6 R. 15, Appellant Br., at 37. This contention again elevates form over substance, and putting aside that the plaintiffs marshal only a single district court case in support of this argument (and a distinguishable one at that[3]), the plaintiffs fail to identify any novel substantive arguments they would have made or specific data they would have presented had the comment window been extended.[4] As the SEC notes, the plaintiffs' contention that additional time would have yielded a quantitative analysis of the 2022 Rescission's costs strains credulity where the lengthy and robust process accompanying the 2020 Rule notably failed to

---

[3]In *Estate of Smith v. Bowen*, 656 F. Supp. 1093 (D. Colo. 1987), the plaintiffs identified specific parties that could not provide responsive comments due to both the brevity of the comment window *and* three accompanying roadblocks: (1) the agency's failure to adequately describe the substance of proposed rule change in the NPRM; (2) the agency's failure to include in the NPRM the results of a "comprehensive study" of the to-be-regulated industry that it had relied upon in crafting the rule (and which did not become available to the public until after the comment window closed); and (3) the complexity of several "interested . . . organizations" whose internal bureaucratic processes slowed their ability to comment. 656 F. Supp. at 1097–98. This showing far exceeds what the plaintiffs have shown here, as they fail to identify a single party that wished to comment yet could not, much less a similar confluence of non-timing-related factors that precluded meaningful comment.

[4]The dissent combats this argument by noting that "establishing prejudice does not require Plaintiffs to demonstrate that, absent the procedural deficiency, the substance of the 2022 Rescission would have changed." Dissent at 16 (citing *United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012)). While true, this argument remains nonresponsive to the SEC's point. The Commission does not assert that the plaintiffs fail to demonstrate that the substance of the rescission would have changed given a longer comment window. Instead, the SEC asserts, correctly, that the plaintiffs fail to highlight any substantive change to the rule *they would have recommended* had the comment window been extended. All told, the plaintiffs fail to identify any argument that the "shortened" thirty-day comment window prevented them from making. This failure fatally undermines their contention that the length of the comment window precluded a meaningful opportunity to give their input.

produce a quantitative analysis of the Rule's benefits. At bottom, highlighting the SEC's refusal to extend the comment window without identifying how an extended comment period would have enhanced the substantive record is an empty gesture.

III.

For the foregoing reasons, we affirm.

———————————

**DISSENT**

———————————

JOHN K. BUSH, Circuit Judge, dissenting.  As the Majority explains, proxy voting advice businesses (PVABs), also called proxy advisors, make recommendations to shareholders regarding voting "by proxy" (as opposed to in person) at shareholder meetings of publicly traded companies.  A proxy advisor and the company it analyzes may not see eye to eye on every issue. When the PVAB recommends a vote to the shareholder, the PVAB shares its views on the matter.  At stake in this appeal is whether the Securities and Exchange Commission will require proxy advisors to facilitate communication of a company's views to shareholders as well. The Majority says that the SEC did enough to rescind its rule mandating these disclosures. I respectfully disagree.

Following almost a decade of research during both Democratic and Republican administrations, the SEC issued a regulation in 2020 (the "2020 Rule") with two components. First, the Commission required PVABs to disclose conflicts of interest (the "Conflict-Disclosure Condition").  Second, it mandated that proxy advisors notify companies of the content of proxy voting advice and provide shareholders with any company response (the "Notice-and-Awareness Conditions").  But less than a year later, and following an administration change, the SEC substantially reversed course.  While it implemented the Conflict-Disclosure Condition, the Notice-and-Awareness Conditions never went into effect.

The agency's rescission of the Notice-and-Awareness Conditions (the "2022 Rescission") is legally deficient for three reasons.  First, the SEC violated the Administrative Procedure Act (APA) because the abbreviated comment period was inadequate for the agency to fully comply with its obligation to "give interested persons an opportunity to participate" in the rulemaking. 5 U.S.C. § 553.  Second, another APA violation occurred because, as the Fifth Circuit recently held, the agency's rationale for rescinding the Notice-and-Awareness Conditions does not survive arbitrary-and-capricious review.  *See Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 811–15 (5th Cir. 2024).  Third and finally, the SEC failed to adequately estimate the costs and benefits of

its dramatic policy shift—an economic review that is required by the Securities Exchange Act of 1934. *See* 5 U.S.C. § 706; 15 U.S.C. § 78c(f). The 2022 Rescission is therefore both procedurally and substantively invalid. It should be vacated in its entirety.

## I.

PVABs have been around for about 40 years. Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice ("2019 Proposed Rule"), 84 Fed. Reg. 66,518, 66,543 (proposed Dec. 4, 2019). They provide services related to the proxy voting process, such as researching shareholder voting proposals, providing voting recommendations, and assisting in casting proxy votes. As the Majority explains, of the five PVABs in the United States, two of them—ISS and Glass Lewis—control approximately 97% of the market for proxy advice. Majority Op. at 4 n.1; 2019 Proposed Rule, 84 Fed. Reg. at 66,543; *see also* Sagiv Edelman, *Proxy Advisory Firms: A Guide for Regulatory Reform*, 62 Emory L.J. 1369, 1374 (2013). As could be expected from their substantial market shares, ISS and Glass Lewis have significant influence over proxy voting decisions.

Critics of PVABs argue that proxy advisors "play[] the role of quasi-regulator, whereby boards feel compelled to make decisions in line with proxy advisors' policies due to their impact on voting." Timothy Doyle, *The Realities of Robo-Voting*, Harv. L. Sch. Forum on Corp. Governance (Nov. 29, 2018), https://corpgov.law.harvard.edu/2018/11/29/the-realities-of-robo-voting/. Leo E. Strine, Jr.—a former chief justice of Delaware Supreme Court and chancellor of the Delaware Court of Chancery, now in private practice—had this to say about the influence of one PVAB, ISS, in particular: it had become commonplace for "powerful CEOs to come on bended knee . . . to persuade the managers of ISS of the merits of their views." Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L 673, 688 (2005). Some have argued that PVABs use their leverage as proxy advisors to win consulting contracts from companies that do not want to fall from the advisor's good graces. *See, e.g.,* Garmin, Comment Letter on Proposed Rule: Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, at 2 (Jan. 27, 2020) (noting that PVABs purposefully assign low ratings to companies and use those ratings "as a tool to sell consulting services to purportedly fix the ratings"). Companies also may use consulting

arrangements to influence the advisor to support the company's position. *See* Exemptions From the Proxy Rules for Proxy Voting Advice ("2020 Rule"), 85 Fed. Reg. 55,082, 55,096 (Sept. 3, 2020) (questioning the "objectivity and independence" of proxy advice where PVABs give voting recommendations to shareholders regarding the same matters on which they had advised companies).

When the PVAB and the company disagree, investors in a few notable instances have voted against PVAB recommendations after the company voiced its disapproval. For example, earlier this year shareholders voted to approve a pay award of over $45 billion for Elon Musk, even though Glass Lewis urged investors to vote down the package as excessive. Jack Ewing & Peter Eavis, *Tesla Shareholders Approve Big Stock Package for Musk*, N.Y. Times (June 13, 2024), https://www.nytimes.com/2024/06/13/business/tesla-shareholder-vote-elon-musk.html. Tesla publicly criticized Glass Lewis's report on the compensation issue, claiming that it "omits key considerations, uses faulty logic, and relies on speculation and hypotheticals." Steven Russolillo, *Tesla Blasts Glass Lewis's Report Urging Against Musk's Pay Package*, Wall St. J. (May 30, 2024, 9:01 AM), https://www.wsj.com/business/autos/tesla-glass-lewis-elon-musk-pay-package-d50b63df.

In another example from earlier this year, ExxonMobil publicly disagreed with Glass Lewis's recommendation to oppose the re-election of the company's lead director, Joseph Hooley. *See* Kevin Crowley, *Exxon Says Glass Lewis Has Conflict of Interest on Proxy*, Bloomberg News (May 15, 2024, 3:18 PM), https://news.bloomberglaw.com/esg/exxon-says-proxy-adviser-glass-lewis-has-conflict-of-interest. Hooley had backed a lawsuit preventing investors from introducing allegedly climate-friendly shareholder proposals that shareholders had twice voted to reject. *Id.* Exxon argued that Glass Lewis should have recused from making recommendations regarding Exxon's leadership because of the firm's alleged conflicted interests: Glass Lewis belongs to Interfaith Center on Corporate Responsibility, a network of organizations that supports proposals to address climate-change matters and that opposed Hooley's lawsuit. *See id.*; David Blackmon, *ExxonMobil Proxy Fight Looms Despite Record Financial Success*, Forbes (May 24, 2024, 8:03 AM), https://www.forbes.com/sites/davidblackmon/2024/05/24/exxonmobil-proxy-fight-

seems-motivated-by-too-much-success/. Shareholders ultimately rejected Glass Lewis's advice and re-elected Hooley. *See* Ross Kerber & Arunima Kumar, *Top Exxon directors cruise to re-election despite activist opposition*, Reuters (May 29, 2024, 3:45 PM), https://www.reuters.com/markets/commodities/exxon-shareholders-re-elect-two-directors-targeted-by-activists-2024-05-29/.

As this latter example suggests, proxy voting advice pertains to not only traditional issues affecting a company's bottom line, but also more recent stakeholder topics, including "Environmental, Social, and Governance" matters, also known as "ESG" issues. Some critics of PVABs express concern that proxy advisors may base their voting advice on ideological agendas that do not always align with the corporate fiduciary objective of maximizing shareholder value. 2020 Rule, 85 Fed. Reg. at 55,125. Also, apart from any particular value judgment, PVABs face criticism that they do not always get their facts right about shareholder proposals and the affected companies. *Id.* at 55,103. According to these critiques, there is need for a shareholder to receive the company's response to the proxy advisor's voting recommendation because it helps ensure a fully balanced and accurate understanding of the issue before a proxy vote is cast. *Id.* at 55,102–03.

PVABs have rejoinders to all of these arguments. Perhaps their strongest point, as the examples from Tesla and ExxonMobil demonstrate, is that companies can overcome a PVAB's adverse recommendation through independent messaging of their own—that is, without the involvement of the proxy advisor in delivering the company's views. *Id.* at 55,108. But for a company besieged by an adverse shareholder proposal that has a PVAB's endorsement, the timing of the company's message in response and its access to the shareholder can be everything. How far the company's voice carries will depend on (1) how soon the company learns of the PVAB's position, and (2) how quickly and effectively the company then communicates to the shareholders its rebuttal of the PVAB's recommendation. *Id.* at 55,108 & n.329 (explaining that although companies can file a response to proxy advice voicing any disagreements, "the efficacy of these responses may be limited, particularly given the high incidence of voting that takes place very shortly after a PVAB's voting advice is released to clients and before such supplemental proxy materials can be filed" (internal quotation marks and citation omitted)).

Not every company has the resources of Tesla or ExxonMobil. A smaller company may find itself losing a battle against a PVAB not because the company's position has less merit, but rather because the PVAB has too much of a headstart and more direct involvement in the shareholder's decision making on proxy votes. *See* Br. for The Biotechnology Innovation Organization as Amicus Curiae Supporting Appellants 2–4, ECF No. 23 (explaining that PVABs' "one-size-fits-all" approach harms smaller companies who lack resources to respond to inaccuracies in proxy advice, or to voice their disagreement).

All companies, regardless of size, must deal with PVABs that understandably oppose corporate management that questions proxy advice. So, there is an inherent incentive for PVABs to resist any SEC requirement that might make it easier for a company to communicate more effectively to shareholders its response to the proxy advisor's recommendation. *See generally* Glass Lewis & Co., Comment Letter on Proposed Rule: Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, at 12 (Feb. 3, 2020) (expressing PVABs' concern that companies' involvement in the proxy process could have a "'chilling effect,'" and noting that if "'every disagreement over a subjective determination like a say-on-pay vote is likely to lead to a messy confrontation with management, [PVABs] may be less inclined to issue negative advice'") (internal citation and quotation marks omitted). This adversarial dynamic between PVABs and companies has long existed, and corporate concern about proxy-advisor influence over shareholder voting has increased over time. The rapid growth of PVABs and the scope of their activities have led to calls for reform.

Beginning in 2010, during President Obama's administration, the SEC conducted a "comprehensive review" of the proxy system. Mary L. Schapiro, *Opening Statement at the SEC Open Meeting* (July 14, 2010), https://www.sec.gov/news/speech/2010/spch071410mls.htm. That almost decade-long process culminated in the 2020 Rule, which, among other things, required PVABs to alert companies of their voting recommendations and to notify shareholders of the companies' response. 85 Fed. Reg. at 55,117. But, as noted above, the 2020 Rule never went into effect.

The relevant events were these: on June 1, 2021, the Commission announced it would not enforce the Notice-and-Awareness Conditions, and ten days after that, the new SEC Chair and

members of the Commission held a closed-door meeting with opponents of the conditions. SEC Div. of Corp. Fin., Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rules 14a-1(1), 14a-2(b), 14a-9 (June 1, 2021), https://www.sec.gov/news/public-statement/corp-fin-proxy-rules-2021-06-01; Proxy Voting Advice ("2021 Proposed Rescission"), 86 Fed. Reg. 67,383, 67,383 (proposed Nov. 26, 2021). What was discussed at the meeting was never disclosed, but following the meeting, the SEC continued its nonenforcement of the conditions. The Commission's inaction, however, was challenged in court, resulting in a ruling that if the agency wanted to eliminate the Notice-and-Awareness Conditions, it could not do so simply through their non-enforcement. *See Nat'l Ass'n of Mfrs. v. SEC*, 631 F. Supp. 3d 423, 427 (W.D. Tex. 2022). Instead, the Commission had to amend the 2020 Rule through new notice-and-comment rulemaking under the APA. *See id.* So, the SEC belatedly issued a notice of proposed rulemaking and solicited public comment on whether to withdraw the conditions. 2021 Proposed Rescission, 86 Fed. Reg. at 67,384.

The new comment period was only half of what it had been for the 2020 Rule, and it produced less than a tenth of the number of comments received for the prior regulation. *See* 2021 Proposed Rescission, 86 Fed. Reg. at 67,383; Comments on Proposed Rule: Proxy Voting Advice, Release No. 34-93595, https://www.sec.gov/comments/s7-17-21/s71721.htm. Plaintiff-Appellant Chamber of Commerce and others asked for the same 60-day length afforded for the 2020 Rule. They complained that the reduced comment period, which fell over the end-of-the-year holidays and when comments for several other SEC proposed rules were due, did not provide sufficient opportunity for public input. *See, e.g.,* Chamber of Com. of the U.S., Comment Letter on Proposed Rule: Proxy Voting Advice, at 5 (Nov. 30, 2021); Bus. Roundtable, Comment Letter on Proposed Rule: Proxy Voting Advice, at 3 (Dec. 23, 2021). The Chamber and others also noted that 60 days is typically the amount of time that federal agencies allow for comments during rulemaking. Chamber of Com. of the U.S., Comment Letter, at 10. The SEC denied the extension request, citing no emergency or exigent circumstances to justify an abbreviated comment period. The Commission issued the amended regulation in July 2022. Proxy Voting Advice ("2022 Rescission"), 87 Fed. Reg. 43,168, 43,168 (July 19, 2022).

## II.

The first reason why the 2022 Rescission should be vacated is procedural: the SEC failed to provide an adequate opportunity for comment on the proposed 2022 Rescission. The APA requires an agency to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(a), (c). Here, the period that the SEC afforded for such public input did not last long enough.

So, how much time was needed? The APA does not explicitly say. Instead, courts must assess an agency's allotment of time for comments based on the particular circumstances of the proposed regulation at issue, including how complex it is, how much impact it will have, how much public interest it has generated, and whether emergency or exigent conditions justify a shorter comment period. *See Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (considering length of the period and details provided in the notice of proposed rulemaking); *N.C. Growers Ass'n v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (10-day comment period that yielded 800 comments was invalid in part because the agency's prior rulemaking had a 60-day comment period generating 11,000 comments); *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) ("The opportunity for comment must be a meaningful opportunity.").

As the Majority points out, some courts interpreting the APA have concluded that 30 days for comment can be sufficient. Majority Op. at 20 n.2. But that shorter period is not the typical practice, and it is disfavored particularly where, as here, the proposed rulemaking was intended to overturn an earlier rule that had a longer comment period. *See Petry v. Block*, 737 F.2d 1193, 1202 (D.C. Cir. 1984) (30 days for comment "cuts the comment period to the bone"). For example, in *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011), the Third Circuit held that a comment period was inadequate where the agency "gave only 28 days for response, not the usual 90 days" afforded in prior rulemaking. *See also Becerra v. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019) (invalidating 30-day period because agency's prior rulemaking included 120 days for comment); *N.C. Growers Ass'n*, 702 F.3d at

770 (finding that 10-day comment period was deficient where prior rulemaking included 60 days for comment).

Applying the principle from that precedent, a comparison of the two comment periods here demonstrates that the period accompanying the 2022 Rescission was inadequate. For the 2020 Rule, the SEC afforded a 60-day period. It was consistent with the longstanding view, held by the White House under both Democratic and Republican administrations and by the U.S. Administrative Conference, that "a meaningful opportunity to comment . . . should include a comment period of not less than 60 days." R. 35-26 (Exec. Order No. 12866 (Sept. 30, 1993) at 771; R. 35-27 (Exec. Order 13258 (Feb. 26, 2002)); R. 35-28 (Exec. Order No. 13563 (Jan. 18, 2011)); R. 35-29 (86 Fed. 7223 (Jan. 20, 2021)); R. 35-30 (Admin. Conf. of the U.S., Recommendation No. 2011-2; Rulemaking Comments (June 16, 2011) at 791 (recommending on fewer than 60 days for public comment). Chair Gensler purported to share this view. *Hearing on FTC, SEC FY 2023 Budget Requests Before the H. Appropriations Subcomm. On Fin. Servs. & Gen. Gov't* (May 18, 2022) (statement from Gary Gensler that the SEC will "always [give] at least two months" for public comment).

But here, Chair Gensler's SEC gave only 31 days for the 2022 Rescission, bucking tradition and its own precedent affording a 60-day comment period. The Commission cited no emergency or exigent circumstances as justification for its decision. Instead, it pointed only to the fact that it had already solicited input from the public on the Notice-and-Awareness Conditions in 2019, so interested parties did not need as much time to assemble their arguments. But the agency's prior rulemaking was reason to *retain*, not reduce, the 60-day comment period. That is because the SEC's proposed 2022 Rescission would overrule the agency's prior factual determinations that supported the Notice-and-Awareness Conditions. Where an agency announces a new rule based on "factual findings that contradict those which underlay its prior policy," the agency must provide "*more* substantial justification," not less. *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). Additionally, by short-changing the time for comment, the SEC suggested that its mind was already made up and that the comment period was just for show. In fact, the law requires that the Commission remain open to the possibility that comments could persuade it to

retain the Notice-and-Awareness Conditions. *Rural Cellular Ass'n*, 588 F.3d at 1101 ("[I]n order to satisfy [APA requirements], an agency must also remain sufficiently open-minded."). For these reasons, the comment period of the proposed 2022 Rescission at the very least should have been the same length as the comment period afforded for the 2020 Rule.

The Majority contends that the SEC was not required to match the comment period of the 2020 Rule for the 2022 Rescission to be procedurally valid. To be sure, complying with procedural requirements is not merely a numbers game, and the 31-day comment period was not deficient simply because it was short. But here, the agency has not presented any emergency or exigent circumstances that would require shortening the 60-day period normally afforded. To the contrary, the SEC conceded at oral argument that it was in no rush to issue the 2022 Rescission. The agency took six months after the comment period closed to consider revising the proposed rule in response to public comments. Argument Audio at 25:40–25:45. Putting aside the fact that the SEC did not, in fact, make any substantive changes addressing those comments, the agency's devotion of six months for its response to comments undermines any claim that it was forced to act quickly.

Moreover, the "targeted nature" of the 2022 Rescission does not justify a shorter period in 2022. Majority Op. at 20–21. Interested parties could not simply recycle their comments on the 2020 Rule because the Notice-and-Awareness Conditions discussed in the 2022 Rescission were different from the conditions proposed in 2020. As will be discussed in more detail below, the 2020 Rule required PVABs to notify companies of their voting recommendations *before* disseminating advice to investors. However, because the agency removed the Pre-Dissemination Requirement when adopting the 2020 Rule, PVABs' expected burdens of compliance—and conversely, the benefits that they would experience if the conditions were rescinded—had changed by 2022. Considering those substantive changes, interested parties should have been given a fulsome period to respond to the SEC's proposal.

Finally, the Majority holds that even if the comment period was deficient, any procedural error was harmless. Majority Op. at 21–22. It maintains that Plaintiffs cannot succeed on their procedural challenge because they failed to identify information that they would have provided if given additional time, or to show how the agency would have issued a different rule in response

to their comments.   But the record, in fact, discloses that Plaintiffs have established harm. Multiple interested parties asked the SEC to extend the comment period, but the agency denied their requests without explanation.   And contrary to the Majority's claim, Plaintiffs identified other information that could have been presented if the comment period was extended: for example, companies could have gathered data related to the costs they would incur in obtaining copies of PVAB recommendations.  *See, e.g.,* Nasdaq, Comment Letter on Proposed Rule: Proxy Voting Advice, at 4 (Dec. 27, 2021) (reporting that to receive a copy of voting advice from Glass Lewis, companies are required to "purchase [their] annual report[s] from Glass Lewis and pay a $2,000 fee").   The agency also could have received data on internalization costs: the SEC recognized that to the extent rescinding the Notice-and-Awareness Conditions decreases the quality and variety of PVAB advice, shareholders may instead decide to "solely rely upon internal resources to research, analyze, and execute proxies."  2022 Rescission, 87 Fed. Reg. at 43,188.   Of note, the agency could use this data to bolster its economic analysis under the Exchange Act, rather than concluding that the costs and benefits of rescission were not easily quantifiable.

In any event, establishing prejudice does not require Plaintiffs to demonstrate that, absent the procedural deficiency, the substance of the 2022 Rescission would have changed.  Instead, Plaintiffs were only required to show that the procedural error deprived them of a meaningful opportunity to comment.  *See United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012). They have satisfied that requirement here.

The circumstances surrounding the issuance of the 2022 Rescission demonstrate that the SEC needlessly shortened the comment period, and Plaintiffs have shown that the procedural error was not harmless.  Because the Commission's conduct fell short of the APA's procedural standards, the 2022 Rescission should be vacated.

## III.

Vacatur is also required on substantive grounds.  Plaintiffs assert that the 2022 Rescission violates the APA's arbitrary-and-capricious standard because the agency inadequately explained its changed position on the underlying facts.  They also claim that the regulation does not satisfy

Exchange Act requirements because the SEC failed to articulate the economic implications of its new rule. The Majority holds that the 2022 Rescission relies on the same factual findings as those supporting the 2020 Rule, and that the SEC reasonably articulated why it chose the new policy. Majority Op. at 9–14. The record shows otherwise. It demonstrates that the SEC's reasoning, as a substantive matter, violated both the APA and the Exchange Act.

### A. APA Claim

The APA provides that courts should set aside any agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc., v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). Because the 2022 Rescission represents a policy change, to survive arbitrary-and-capricious-review, the SEC must "display awareness that it is changing position" and show that its "new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox*, 556 U.S. at 515.

Plaintiffs claim that under *Fox*, the SEC was required to provide a more detailed explanation for the 2022 Rescission than for the 2020 Rule because its new rule was based on contradictory factual findings. The district court found the same, explaining that when the agency changed how it "balance[ed] [the] various costs and benefits," of the 2020 Rule, the shift was based on a changed "understanding of the relevant factual circumstances." Dist. Ct. Op., R. 74, PageID 2035.

Plaintiffs and the district court are correct. The SEC previously explained that by eliminating the Pre-Dissemination Requirement, the 2020 Rule did "not create the risk that [proxy] advice would be delayed or that the independence thereof would be tainted as a result of a registrant's pre-dissemination involvement." 2020 Rule, 85 Fed. Reg. at 55,112. But in adopting the 2022 Rescission, the agency reversed course, explaining that eliminating the Pre-Dissemination Requirement did not "adequately mitigate[]" timeliness and independence concerns. 2022 Rescission, 87 Fed. Reg. at 43,175. The SEC's changed position as to whether

the Notice-and-Awareness Conditions posed a significant, or an insignificant, risk is itself a factual finding. As the Fifth Circuit explained, "risk is measured on a continuum, and the determination whether a risk is high or low . . . is a factual finding drawn from the record available to an agency or court."[1] Because the agency changed its position on the degree of risk posed by the Notice-and-Awareness Conditions, it was required to give a "more detailed justification" for the change, which it failed to do. *Fox*, 556 U.S. at 515. That failure alone renders the 2022 Rescission arbitrary and capricious.

Even without applying *Fox*'s heightened standard, the SEC's rationale fails to survive arbitrary-and-capricious review because the agency did not adequately address the consequences of the rescission. As explained above, under the APA an agency must examine "relevant data" and reasonably explain its decision in light of the information it possesses. *Motor Vehicle Mfrs.*, 463 U.S. at 42. Relevant data include issues raised by commenters "'that can be thought to challenge a fundamental premise' underlying the proposed agency decision." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)).

Plaintiffs identify two issues that the SEC failed to adequately consider: (1) whether the Notice-and-Awareness Conditions posed a risk to the timeliness, cost, and independence of PVAB advice; and (2) whether PVABs' voluntary efforts compensate for the Notice-and-Awareness Conditions. Appellants' Br. at 46–52. Both considerations constitute key aspects of the rescission that the agency inadequately addressed.

Take the first factor. The SEC stated that it adopted the 2022 Rescission, in part, because commenters had "reiterated [their] concerns" that the Notice-and-Awareness Conditions would "impair the independence of proxy voting advice, impede the timeliness of proxy voting advice,

---

[1] *Nat'l Ass'n of Mfrs.*, 105 F.4th at 812. In support of its holding that the "quantum of risk assessed by an agency [i]s a factual finding," the Fifth Circuit cited cases involving APA challenges and those from other legal contexts. *See id.* at 811 (citing *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015); *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) ("The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings.")). This circuit has similarly recognized that assessing the amount of risk is a factual determination. *See United States v. Johnson*, 116 F.3d 163, 165 (6th Cir. 1997) (determining whether a "defendant's actions created a substantial risk of death or serious bodily injury" is a "fact-intensive inquir[y]"); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 82 (6th Cir. 1995) (question of "whether or not there existed a pervasive risk of harm in" a particular location "is an open question of fact").

and increase PVABs' compliance costs." 2022 Rescission, 87 Fed. Reg. at 43,171. But by simply reciting the complaints lodged against the 2020 Rule, the agency failed to consider how the 2020 Rule as proposed differed from the regulation as adopted.

Commenters acknowledged in 2020 that by including the Pre-Dissemination Requirement, companies could exert undue influence over PVABs in formulating their recommendations. *See, e.g.,* N. Am. Sec. Admins. Ass'n, Inc., Comment Letter on Proposed Rule: Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, at 9 (Feb. 3, 2020). They also expressed concern that forcing PVABs to interact with companies before disseminating their advice to investors would cause undue delay, which could increase costs for investors. *See* Inv. Co. Inst., Comment Letter on Proposed Rule: Amendments to Exemptions From the Proxy Rules for Proxy Voting Advice, at 2 (Feb. 3, 2020). However, those comments did not address how omitting the Pre-Dissemination Requirement would impact the timely dissemination of proxy advice or PVAB independence. Even those supporting the 2022 Rescission acknowledged this inconsistency: one commenter acknowledged that the final 2020 Rule "made substantial modifications to the proposal," and that the public could not comment on the regulation as adopted. *See* N.Y. State Comptroller, Comment Letter on Proposed Rule: Proxy Voting Advice, at 2 (Dec. 27, 2021).

Rather than meaningfully address the changes to Notice-and-Awareness Conditions, the SEC merely regurgitated comments from 2020. With respect to timeliness, it vaguely referred to "additional compliance burdens" that could "muddle the timely delivery of materials to fund managers." 2022 Rescission, 87 Fed. Reg. at 43,171. Regarding independence, the agency cited the concerns of one interested party who opined that the Notice-and-Awareness Conditions might "draw out the voting process," which could cause PVABs to "feel pressure to tilt voting recommendations in favor of management." *Id.* at 43,175 n.118 (citing Council of Institutional Investors, *Leading Investor Group Dismayed by SEC Proxy Advice Rules* (July 22, 2020), https://www.cii.org/july22_sec_proxy_advice_rules). But by only acknowledging concerns related to timeliness and independence, without explaining how those concerns differed under a prior version of the 2020 Rule, the agency failed to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).

Notably, it is not clear that the Commission *could* have identified how the 2020 Rule negatively impacted timeliness or independence. As the Fifth Circuit explained, it is "wholly implausible" to find that directing PVABs to share proxy advice with companies at the same time they shared it with clients would delay the delivery of the firms' recommendations. *See Nat'l Ass'n of Mfrs.*, 105 F.4th at 813. And while requiring communication with companies could incentivize PVABs to adopt pro-management recommendations, the agency could not rely on comments from the 2020 Rule to support that proposition. *See id.* at 813–14.

Additionally, as to the second factor mentioned above, the SEC failed to address how PVABs' voluntary practices would affect compliance burdens. In support of its conclusion that the Notice-and-Awareness Conditions were no longer necessary, the agency found that six major PVABs adhere to standards imposed by the Best Practices Principles Group (BPPG). 2022 Rescission, 87 Fed. Reg. at 43,187; *see also* 2021 Proposed Rescission, 86 Fed. Reg. at 67,386–88. But commenters to the proposed rule claimed that PVABs' efforts to comply with BPPG standards did not justify rescinding the Notice-And-Awareness Conditions for several reasons: namely, because (1) PVABs' voluntary practices impose significant costs on public companies, (2) BPPG standards do not expressly require PVABs to disseminate advice to companies, and (3) the agency deemed those same voluntary efforts inadequate in 2020. *See* Nasdaq, Comment Letter on Proposed Rule: Proxy Voting Advice, at 2 (Dec. 27, 2021) (noting that Glass Lewis provides drafts of proxy advice at a fee); Soc'y for Corp. Governance, Comment Letter on Proposed Rule: Proxy Voting Advice, at 9 (Dec. 27, 2021) (stating that BPPG standards are nonbinding and do not require public company review).

The SEC did not meaningfully address commenters' concerns about the efficacy of PVABs' voluntary practices. On the one hand, having recognized that most PVABs are already meeting the requirements of the Notice-And-Awareness Conditions voluntarily, the agency did not explain how the rule as adopted created additional compliance burdens. *See Nat'l Ass'n of Mfrs.*, 105 F.4th at 814 (recognizing that "there is no change in the potential threat of litigation" under the 2020 Rule because "ISS and Glass Lewis voluntarily provide some registrants with their proxy advice at the time of its dissemination to clients").

On the other hand, the agency failed to respond to commenters' concerns that PVABs' voluntary efforts to disseminate advice were just that—voluntary—such that they would not yield the same transparency and information benefits as the 2020 Rule. The SEC asserted that even if PVABs' voluntary efforts "do not perfectly replicate the requirements of the [Notice-And-Awareness Conditions]," they posed less of a risk to the "cost, timeliness, and independence" of proxy advice than those conditions. 2022 Rescission, 87 Fed. Reg. at 43,177. But that explanation fails to articulate exactly how proxy advisors are less burdened under a voluntary regime, or why the agency had reached a different conclusion just two years earlier. The agency cannot simply invoke a "timeliness, independence, and cost mantra" to survive arbitrary-and-capricious review, without providing further explanation. Argument Audio at 13:35–13:45.

In adopting the 2022 Rescission, the SEC insisted that the Notice-And-Awareness Conditions would threaten the timeliness, cost, and independence of PVAB advice without explaining its changed view of the underlying facts, accounting for changes to the 2020 Rule as adopted, or acknowledging the mitigating effects of PVABs' voluntary practices. In light of the significant holes in the SEC's reasoning, Plaintiffs should prevail on their substantive APA claim.

**B. Exchange Act Claim**

Plaintiffs' Exchange Act claim also has merit. As the Majority notes, the Exchange Act imposes a unique statutory obligation on the SEC to "apprise itself . . . of the economic consequences of a proposed regulation," *Chamber of Com. v. SEC,* 412 F.3d 133, 144 (D.C. Cir. 2005). The Fifth Circuit recently recognized that the Exchange Act vests the SEC with "discretion to determine the mode of analysis that most allows it 'to determine as best it can the economic implications of the rule it has proposed.'" *Chamber of Com. v. SEC*, 85 F.4th 760, 774 (5th Cir. Oct. 31, 2023); *cf. Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (upholding agency's qualitative analysis where benefits were "unquantifiable"). But while reliance on quantitative data is not mandatory, the agency may not rely on "mere speculation" when analyzing the economic consequences of its proposed rule, particularly where empirical evidence is "readily available." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1150 (D.C. Cir. 2011);

*Chamber of Com. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (invalidating a SEC regulation where the agency claimed that it lacked a "reliable basis" for estimating the costs of its proposed rule, finding that the agency could have at least provided "the range within which [the] cost of compliance will fall").

The SEC did not make a good-faith effort to approximate either the costs or benefits of rescinding the 2020 Rule. For starters, the Commission failed to adequately estimate the burdens that companies would experience because of the rescission. The agency acknowledged that its analysis would rely on only qualitative data because it had "not received information or data that would permit a quantitative analysis."[2] But this is not a case where "empirical evidence" regarding the costs of rescission was not "readily available." *Bus. Roundtable*, 647 F.3d at 1150. Here, certain consequences of rescinding the 2020 Rule were quantifiable, such as the costs associated with correcting errors in PVAB recommendations. In the final release adopting the 2022 Rescission, the Commission recognized that errors in proxy advice do not pose sufficient risks to the proxy system to justify keeping the Notice-and-Awareness Conditions because companies are able to correct any errors through supplemental filings. 2022 Rescission, 87 Fed. Reg. at 43,176. However, that finding fails to account for the resources that companies will be forced to divert to make those filings during a compressed time period. Nat'l Ass'n of Mfrs. Outlook Survey, Fourth Quarter 2018, R. 35-10, PageID 643, 648 (reporting that 56% of companies surveyed "divert[ed] resources from . . . core business functions" to respond to PVAB recommendations). Also, the fact that companies *can* correct misinformation through supplemental filings does not mean that their filings will sway shareholders, or that those filings will even reach shareholders prior to a vote. Am. Council for Cap. Formation, Comment Letter on Proposed Rule: Proxy Voting Advice, at 7 (Dec. 22, 2021) (noting that supplemental filings "are often ineffective").

Additionally, as discussed above, the SEC found that companies may rely on internal resources to provide shareholder recommendations following the rescission. 2022 Rescission, 87

---

[2]2022 Rescission, 87 Fed. Reg. at 43,186. This claim is suspect, given that the agency likely could have amassed data relevant to its Exchange Act inquiry if it had extended the comment period. This court should not sanction the SEC's attempt to rely on its procedural deficiency as justification for giving short shrift to its substantive analysis.

Fed. Reg. at 43,188. The agency could have provided data on how internalizing costs would impact registrants, or how that impact could differ depending on the size of the company. *See* J.W. Verret, Comment Letter on Proposed Rule: Proxy Voting Advice, at 10 (Dec. 21, 2021) (noting that "the impact of this rule on the market more broadly," rather than on PVABs, is a "more appropriate focus" under the Exchange Act). Instead, its conclusion that the rescission "could increase costs to investors and registrants" by "reducing the overall mix of information available to PVABs' clients" had "no basis beyond mere speculation." 2022 Rescission, 87 Fed. Reg. at 43,187; *Bus. Roundtable*, 647 F.3d at 1150.

With respect to the benefits of rescission, the agency merely referred to its assessment of the costs of complying with the 2020 Rule and stated that the rescission would benefit PVABs by reducing those direct costs. 2022 Rescission, 87 Fed. Reg. at 43,186. That cursory analysis is insufficient, in part because the agency did not consider how PVABs had implemented practices to comply with the Notice-and-Awareness Conditions since the 2020 Rule were adopted. The SEC could not rely on comments to the 2020 Rule when assessing PVABs' voluntary efforts, because the nature of those voluntary efforts had changed since 2020. Ctr. on Exec. Comp., Comment Letter on Proposed Rule: Proxy Voting Advice, at 7 (Dec. 27, 2021) (noting that since publication of the 2020 Rule, ISS has become more resistant to addressing errors or misstatements in proxy advice).

Nor could the SEC simply state that it was "unable to quantify the full range" of benefits to PVABs because the precise costs of the Notice-and-Awareness Conditions would "vary depending on each PVAB's current practices and how they implement the new conditions." 2022 Rescission, 87 Fed. Reg. at 43,186. Instead, the agency should have attempted to specify the nature of PVABs' voluntary efforts, or address how those efforts could impact the benefits of rescission. The SEC did not satisfy the Exchange Act by simply stating that the benefits of rescission will vary, particularly where data that would have enabled the agency to give a more precise estimate was readily available.

**IV.**

Because the 2022 Rescission violates the APA and the Exchange Act, the regulation should be vacated.[3] The APA requires courts to "hold unlawful and set aside" any agency action that violates the statute's requirements. 5 U.S.C. § 706(2). "When a rule is contrary to law, the 'ordinary practice is to vacate it.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 673–74 (D.C. Cir. 2019) (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)); *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (stating that "vacatur is the normal remedy" for unlawful agency action). But in "'rare cases,'" a court may exercise its equitable authority and remand without vacating the rule, "so that the agency can 'correct its errors.'" *Am. Bankers Ass'n*, 934 F.3d at 674 (quoting *United Steel*, 925 F.3d at 1287). In determining whether to vacate a regulation, we look to "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *United Steel*, 925 F.3d at 1287.

Vacatur is appropriate here for two reasons. First, the SEC's failure to provide an adequate comment period is a "fundamental flaw" that alone justifies vacating the regulation. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("Failure to provide the required notice and to invite public comment . . . 'normally' requires vacatur of the rule."). Second, the Commission failed to make a "strong showing" that the deficiencies in its reasoning are not sufficiently serious, such that vacatur is not required. *Am. Bankers Ass'n*, 934 F.3d at 674. Even if the agency received additional comments to its proposed rule, it is unlikely that it could explain why the Notice-and-Awareness Conditions negatively impacted the timeliness and independence of proxy advice to such a degree that they should be rescinded. The agency's bare assertion that it could "further explain its policy choice" is unpersuasive. Appellees' Br. at 52.

---

[3]Although the Fifth Circuit held that SEC's rationale for the 2022 Rescission was arbitrary and capricious, the court did not vacate the entire regulation. Instead, the court severed the Notice-and-Awareness Conditions from the remainder of the regulation, vacated only that provision, and remanded the case to the agency. *See Nat'l Ass'n of Mfrs.*, 105 F.4th at 815–16. Because the Fifth Circuit did not vacate the regulation in its entirety—which is the relief sought by Plaintiffs here—the dispute before our panel remains live.

That the 2022 Rescission contains a severability clause does not alter this conclusion. A court may sever an unlawful provision of an agency regulation if it finds that (1) "the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted," and (2) "the parts of the regulation that remain [are] able to function sensibly without the stricken provision." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (internal citations and quotation marks omitted). The Commission claims that the Notice-and-Awareness Conditions can be severed from the remainder of the regulation, but it does not explain how its procedural deficiencies affect only the challenged conditions. Nor does it claim that it would have promulgated the 2022 Rescission without the Notice-and-Awareness Conditions. The regulation therefore should be vacated in its entirety.

## V.

The SEC is entitled to shift its policy priorities following a change in leadership—even where that change is made for purely political reasons. That said, the APA provides neutral requirements that the agency must satisfy, regardless of its policy goals or prior positions. The SEC must give the public adequate opportunity to provide input on its proposed rule, reasonably respond to that input when explaining its decision, and adequately estimate the economic impact of its regulation. Because the SEC failed to comply with any of these statutory requirements in adopting the 2022 Rescission, I respectfully dissent.